# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

LOTUS INDUSTRIES, LLC D/B/A
CENTRE PARK BAR; CHRISTOPHER
WILLIAMS; ROBERT DAVIS; and
A FELON'S CRUSADE FOR
EQUALITY, HONESTY, AND
TRUTH,

      Plaintiffs,

  v.

CITY OF DETROIT; DENNIS
ARCHER JR.; IGNITION MEDIA;
TOTAL OUTDOOR; and RUTH
JOHNSON,

      Defendants.

and

CITY OF DETROIT DOWNTOWN
DEVELOPMENT AUTHORITY,

      Respondent.

Case No. 2:17-cv-13482
Hon. Sean F. Cox
Mag. Anthony P. Patti

---

**PATERSON LAW FIRM**
By:  Andrew A. Paterson (P18690)
Counsel for Plaintiffs
2893 East Eisenhower Parkway
Ann Arbor, Michigan 48108
(248) 568-9712
aap43@outlook.com

**KOTZ SANGSTER WYSOCKI P.C.**
By: Jeffrey M. Sangster (P30791)
    Anthony M. Sciara (P75778)
Counsel for Respondent DDA
400 Renaissance Center
Suite 3400
Detroit, Michigan 48243
313-259-8300
jsangster@kotzsangster.com
asciara@kotzsangster.com

---

**HONIGMAN LLP**
By: Raymond W. Henney (P35860)
     Derek R. Mullins (P81422)
Counsel for Dennis Archer, Jr. and
Ignition Media
600 Woodward Avenue
Suite 2290
Detroit, Michigan 48226
313-465-7312
rhenney@honigman.com
dmullins@honigman.com

**CITY OF DETROIT LAW DEPARTMENT**
By:  James D. Noseda (P52563)
Counsel for City of Detroit
2 Woodward Avenue, 5th Floor
Detroit, Michigan 48226
(313) 224-4550
nosej@detroitmi.gov

## RESPONDENT CITY OF DETROIT DOWNTOWN DEVELOPMENT AUTHORITY'S MOTION FOR A PROTECTIVE ORDER IN CONNECTION WITH THE COURT'S [119] ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF CHRISTOPHER WILLIAMS'S MOTION TO COMPEL

Now comes Respondent City of Detroit Downtown Development Authority, by its counsel, Kotz Sangster Wysocki P.C., in accordance with Federal Rules of Civil Procedure 26 and 45, and for its Motion for a Protective Order in Connection with the Court's [119] Order Granting in Part and Denying in Part Christopher William's Motion to Compel, states:

WHEREFORE, Respondent City of Detroit Downtown Development Authority respectfully requests that, in accordance with Federal Rules of Civil Procedure 26 and 45, and for the reasons stated in its brief in support of this motion and the exhibits appended thereto, this Court grant its Motion for a Protective Order in Connection with the Court's [119] Order Granting in Part and Denying in Part Christopher William's Motion to Compel.

Respectfully submitted,

**KOTZ SANGSTER WYSOCKI P.C.**

Dated: April 19, 2019          By:   /s/ Jeffrey M. Sangster

Jeffrey M. Sangster (P30791)
Anthony M. Sciara (P75778)
Counsel for Respondent DDA

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

LOTUS INDUSTRIES, LLC D/B/A
CENTRE PARK BAR; CHRISTOPHER
WILLIAMS; ROBERT DAVIS; and
A FELON'S CRUSADE FOR
EQUALITY, HONESTY, AND
TRUTH,

     Plaintiffs,

  v.

CITY OF DETROIT; DENNIS
ARCHER JR.; IGNITION MEDIA;
TOTAL OUTDOOR; and RUTH
JOHNSON,

     Defendants.

and

CITY OF DETROIT DOWNTOWN
DEVELOPMENT AUTHORITY,

     Respondent.

Case No. 2:17-cv-13482
Hon. Sean F. Cox
Mag. Anthony P. Patti

---

PATERSON LAW FIRM
By:  Andrew A. Paterson (P18690)
Counsel for Plaintiffs
2893 East Eisenhower Parkway
Ann Arbor, Michigan 48108
(248) 568-9712
aap43@outlook.com

KOTZ SANGSTER WYSOCKI P.C.
By: Jeffrey M. Sangster (P30791)
   Anthony M. Sciara (P75778)
Counsel for Respondent DDA
400 Renaissance Center
Suite 3400
Detroit, Michigan 48243
313-259-8300
jsangster@kotzsangster.com
asciara@kotzsangster.com

---

**HONIGMAN LLP**
By: Raymond W. Henney (P35860)
    Derek R. Mullins (P81422)
Counsel for Dennis Archer, Jr. and
Ignition Media
600 Woodward Avenue
Suite 2290
Detroit, Michigan 48226
313-465-7312
rhenney@honigman.com
dmullins@honigman.com

**CITY OF DETROIT LAW
DEPARTMENT**
By:  James D. Noseda (P52563)
Counsel for City of Detroit
2 Woodward Avenue, 5th Floor
Detroit, Michigan 48226
(313) 224-4550
nosej@detroitmi.gov

## RESPONDENT CITY OF DETROIT DOWNTOWN DEVELOPMENT AUTHORITY'S MOTION FOR A PROTECTIVE ORDER IN CONNECTION WITH THE COURT'S [119] ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF CHRISTOPHER WILLIAMS'S MOTION TO COMPEL

Now comes Respondent City of Detroit Downtown Development Authority, by its counsel, Kotz Sangster Wysocki P.C., in accordance with Federal Rules of Civil Procedure 26 and 45, and for its Brief in Support of its Motion for a Protective Order in Connection with the Court's [119] Order Granting in Part and Denying in Part Christopher William's Motion to Compel, states:

## QUESTIONS PRESENTED

A. Should the Court extend the time for City of Detroit Downtown Development Authority's ("DDA's") compliance with the Court's [119] Order Granting in Part and Denying in Part Christopher William's ("Williams's") Motion to Compel ("Order") for 90 days?

> DDA:             Yes.
>
> Williams:     No.

B. In order to avoid imposing an undue burden and significant expense on nonparty DDA, should Williams be ordered to pay DDA a reasonable portion of the costs of complying with the Order before DDA must undertake further efforts to comply with the Order?

> DDA:             Yes.
>
> Williams:     No.

## CONCURRENCE STATEMENT

In accordance with Local Rule 7.1, and this Court's Practice Guidelines, on April 19, 2019, at 10:00 a.m., there was a telephone conference between counsel for DDA and Williams during which counsel for DDA explained the nature of this motion, and its legal basis, and requested but did not obtain, concurrence in the relief sought.  (See Email Chain, attached as Exhibit 1).

## CONTROLLING OR MOST APPROPRIATE LEGAL AUTHORITIES

A. Fed. R. Civ. P. 26

B. Fed. R. Civ. P. 45

C. *Hennigan v. Gen. Elec. Co.*, 2012 WL 13005370, *1-2 (E.D. Mich., April 2, 2012)

# TABLE OF CONTENTS

QUESTIONS PRESENTED ............................................................................... iii

CONTROLLING OR MOST APPROPRIATE LEGAL AUTHORITIES ................................ iv

TABLE OF CONTENTS ................................................................................ v

INDEX OF AUTHORITIES ............................................................................ vi

BACKGROUND ...................................................................................... 1

LEGAL STANDARD .................................................................................. 3

ARGUMENT ......................................................................................... 4

    I. The Court Should Allow A 90-Day Extension For DDA To Comply With The Order .. 4

    II. This Court Should Order Williams To Pay DDA A Reasonable Share Of The Significant Expense *Before* DDA Is Required To Undertake Further Efforts To Comply With The Order ................................................................................ 6

## <u>Index of Authorities</u>

Page(s)

Cases

*Davis v Johnson*,
   664 F App'x 446 (6th Cir. 2016) .................................................................. 10, 12
*DeGeer v. Gillis*,
   755 F. Supp. 2d 909 (N.D. Ill. 2010) ..................................................................... 6
*Hennigan v. Gen. Elec. Co.*,
   2012 WL 13005370 (E.D. Mich., April 2, 2012) ........................................... 4, 6, 9
*Volunteer Energy Services, Inc. v. Option Energy, LLC*,
   2012 WL 13018688 (W.D. Mich., February 23, 2012) ........................................ 7

Statutes

MCL 600.2591 ........................................................................................................ 11

Rules

Fed. R. Civ. P. 26(b)(2)(B) ...................................................................................... 3
Fed. R. Civ. P. 26(c)(1)(B) ...................................................................................... 3
Fed. R. Civ. P. 45 ..................................................................................................... 4
Fed. R. Civ. P. 45(d)(1) ........................................................................................... 3
Federal Rules of Civil Procedure 26 and 45 .................................................. 3, 2, 4
MCR 2.114 .............................................................................................................. 12
MCR 2.625(A)(2) .................................................................................................... 11
MCR 7.216(C) ........................................................................................................ 11

## BACKGROUND

On September 13, 2018, Williams issued a Subpoena ("Subpoena") to Respondent DDA. The Subpoena asked for 13 separate categories of documents. On September 27, 2018, DDA served an Objection to the Subpoena. On January 9, 2018, the Court allowed Williams's to file a motion asking the Court to compel production of the documents requested in the Subpoena.[1] On January 27, 2019, Williams filed a motion to compel production of the documents requested in the Subpoena. On February 11, 2019, DDA filed a response to the motion to compel production of the documents requested in the Subpoena.

After this Court heard oral arguments, on March 27, 2019, the Court entered the Order. (See Order, attached as Exhibit 2). The Order denied 10 of the 13 requests, but partially granted 3 of the requests. (Id.). According to the Order, by April 26, 2019, DDA is required to produce documents responsive to the following requests, but limited to those from November 19, 2016, to the present:

4. Copies of any and all emails sent to and/or from Rebecca Navin from January 2015 to the present that mention, relate and/or pertain to Centre Park Bar, Lotus Industries LLC, Paradise Valley, Paradise Valley bidding process, Christopher Williams, Kenneth Scott Bridgewater, Dennis Archer Jr., Ignition Media, Gotham Partners.

---

[1] On November 6, 2018, this Court ordered Williams to obtain permission from the Court before filing any discovery motions. (See ECF Doc. No. 88).

5. Copies of any and all emails sent to and/or from Moddie Turay from January 2015 to the present that mention, relate and/or pertain to Centre Park Bar, Lotus Industries LLC, Paradise Valley, Paradise Valley bidding process, Christopher Williams, Kenneth Scott Bridgewater, Dennis Archer Jr., Ignition Media, Gotham Partners.

6. Copies of any and all emails sent to and/or from Mark Denson from January 2015 to the present that mention, relate and/or pertain to Centre Park Bar, Lotus Industries, LLC, Paradise Valley, Paradise Valley bidding process, Christopher Williams, Kenneth Scott Bridgewater, Dennis Archer, Jr., Ignition Media, Gotham Partners.

(Id.).  The Order also acknowledges DDA may withhold documents on the basis of privilege and directs DDA to produce a federally compliant privilege log. (Id.).[2]

DDA intends to produce the documents ordered by the Court.  Since the Order was entered, however, DDA has discovered the volume of potentially responsive electronically stored information, which must be exported, uploaded, reviewed, and produced is *substantially* larger than anticipated.  The process will impose a significant expense on DDA and require far more time to complete than allowed by the Order.  DDA has discussed these issues with Williams, asked for additional time to produce, and requested Williams pay a reasonable portion of the expense so as to avoid imposing an undue burden on DDA.  Williams has not agreed.  (See Exhibit 1).  Accordingly, for the reasons discussed below, DDA

---

[2] The order further limits "the use and disclosure of … documents produced pursuant to this Order … to **this lawsuit only**."  (Exhibit 2) (emphasis in original).

2

requests this Court enter a protective order, which allows 90 additional days to produce and orders Williams to pay a reasonable portion of the expense before DDA must undertake further efforts to comply with the Order.

## LEGAL STANDARD

A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. Fed. R. Civ. P. 45(d)(1). If a party can show (through a motion for protective order) electronically stored information is not reasonably accessible because of undue burden or cost, the party need not provide discovery of such electronically stored information. Fed. R. Civ. P. 26(b)(2)(B). A party or any person from whom discovery is sought may move for a protective order, which protects the party or person from annoyance, embarrassment, oppression, or undue burden or expense, including an order specifying the time and place, or the allocation of expenses, for the disclosure or discovery. Fed. R. Civ. P. 26(c)(1)(B).

<u>ARGUMENT</u>

### I.   The Court Should Allow A 90-Day Extension For DDA To Comply With The Order

The Order was entered on March 27, 2019.  The Order directs DDA to produce responsive documents and a federally compliant privilege log by April 26, 2019.[3]  The Order requires DDA to produce "any and all emails sent to and/or from" Rebecca Navin, Moddie Turay, and Mark Denson "from [November 19, 2016] to the present that mention, relate and/or pertain to Centre Park Bar, Lotus Industries LLC, Paradise Valley, Paradise Valley bidding process, Christopher Williams, Kenneth Scott Bridgewater, Dennis Archer Jr., Ignition Media, [and] Gotham Partners."

In order to comply with the Order, DDA must do the following: (1) have a third-party technology consultant export all emails to/from Rebecca Navin, Moddie Turay, and Mark Denson from November 19, 2016, to the present; (2) have the third-party technology consultant deliver the data to counsel for DDA; (3) have counsel upload the data to its third-party e-discovery platform (Nextpoint); (4) have counsel create a series of search terms designed to identify responsive communications; (5) have counsel use the search terms to segregate the responsive

---

[3] The Court expressly referenced a privilege log in the Order because, in DDA's response, and at the hearing, DDA noted the certainty privileged materials will be involved.  This was/is because, aside from outside counsel's possible involvement with many communications, one of the three subject individuals, Rebecca Navin, is general counsel to DDA.

communications; (6) have counsel review the segregated responsive communications for privileged materials; (7) have counsel create a federally-compliant privilege log identifying withheld materials; (8) have counsel prepare the non-privileged communications for disclosure; and (9) have counsel produce the non-privileged communications and privilege log to Williams.

Significantly, in order to accomplish the first step, DDA's third-party technology consultant has estimated approximately 48.5 Gigabytes ("GB") of data will be exported for delivery to counsel. (See April 10, 2019 E-mail, attached as Exhibit 3). This 48.5 GB of data includes approximately 121,264 e-mail communications and attachments. (See April 16, 2019 E-mail, attached as Exhibit 4). While the search terms used by counsel to identify and segregate responsive materials should narrow the volume for review, given the extremely large initial data set, there will nonetheless remain a substantial privilege review project, which requires the use of multiple attorneys over approximately 11 weeks. (See Johnson Affidavit at ¶ 11, attached as Exhibit 5; see also Lumen Legal Statement of Work, attached as Exhibit 6). Accordingly, DDA requests a 90-day extension to comply with the Order.

## II.   This Court Should Order Williams To Pay DDA A Reasonable Share Of The Significant Expense *Before* DDA Is Required To Undertake Further Efforts To Comply With The Order

It is well-established that cost-shifting, in the context of a subpoena, should occur when an order requiring compliance subjects a non-party to "significant expense." *Hennigan v. Gen. Elec. Co.*, 2012 WL 13005370, *2 (E.D. Mich., April 2, 2012). Protection of a non-party from significant expense, however, does not necessarily mean the party issuing the subpoena must bear the entire cost of compliance. *Id.* Courts have instead considered three equitable factors when considering cost-shifting and non-parties: (1) whether the nonparty has an interest in the outcome of the case; (2) whether the nonparty can more readily bear its costs than the requesting party; and (3) whether the litigation is of public importance. *Id.* (citing *DeGeer v. Gillis*, 755 F. Supp. 2d 909, 928 (N.D. Ill. 2010)).

These factors counsel in favor ordering Williams to pay DDA a reasonable share of the expense of production before DDA undertakes efforts to comply with Order. First, DDA has no interest in the outcome of this case. This is because the outcome of this case has no impact on DDA. DDA is not a party. The case Williams pursued against DDA was dismissed as a sanction because of "the repeated misrepresentations by [Andrew Paterson] and [Paterson's and Williams's] failures to comply with discovery orders – despite warnings and the imposition of

less severe sanctions." (See Dismissal Order, attached as Exhibit 7).[4]  And, this Court has already prohibited Paterson and Williams from using or disclosing any documents provided by DDA pursuant to the Order for anything other than "this lawsuit." (Exhibit 2).

Second, while DDA acknowledges (upon information and belief) DDA can more readily bear the expense of production than Williams, the analysis does not simply end there.  The factor is part of an "equitable" cost-shifting analysis. Equity means fairness.  Williams's affirmative duty to take reasonable steps to avoid imposing an undue burden on DDA is not categorically eliminated merely because his financial means are comparably less.  See *Volunteer Energy Services, Inc. v. Option Energy, LLC*, 2012 WL 13018688, *1 (W.D. Mich., February 23, 2012).  Given these competing factors, while it would not be appropriate to ask Williams to pay all of expense for production, it is certainly equitable for Williams to pay a reasonable portion (discussed below) of the expense of production, especially given Paterson's and his clients' (including Williams) extensive history of sanctionable conduct in this case and many others (discussed below).

---

[4] At the conclusion of Williams's case against DDA (other parties and claims remain), the dismissal order will become final and res judicata will attach.  In other words, DDA is no longer at risk of being sued by Paterson, Williams, and their cohorts in connection with the allegations underlying this case and the one against DDA.

Finally, the litigation has no real public importance.  Williams will undoubtedly point to his self-serving conclusory allegations and suggest the case is about to "uncovering" some widespread "conspiracy" among public officials to "undermine the integrity" of a public bidding process (or the like).  Yet, in over two years of litigation against DDA, DEGC, City of Detroit, Dennis Archer, Jr. and others – in multiple forums – Williams, Paterson, and their cohorts have not identified *one piece of objective evidence* supporting their central theme.[5]  In short, any purported "public importance" derived from the conclusory allegations in Williams's complaint is *belied* by the absence of any evidence supporting those allegations.

Given the above, DDA asks this Court to order Williams to pay a reasonable share of the expense of complying with the Order.  The estimated expense of complying with the Order is as follows:

---

[5] In this regard, DDA has attached DEGC's and City of Detroit's Motions for Summary Judgment in the case before Judge Michelson.  As the motion reveals, there is no evidence of any conspiracy.  (See Motions for Summary Judgment, attached as Exhibits 8 and 9).

| Activity | Description | Expense |
|---|---|---|
| Data Extraction from DDA System | Approximately 48.5 GB of data will be extracted from relevant email accounts | $9,750.00[6] |
| Data Import to Counsel's E-Discovery Platform | All data extracted from relevant email accounts will be uploaded to counsel's e-discovery platform (Nextpoint) | $250 per GB of storage x 48.5 GB = 12,125.00[7] |
| Identify and Segregate Responsive Information | Counsel will create search terms and use those search terms to identify and segregate responsive information | Approximately four hours of attorney time x $185.00 per hour = $740.00[8] |
| Conduct Privilege Review | Counsel will review all responsive information to identify privileged communications, which will involve the use of multiple attorneys reviewing for approximately 11 weeks. | $103,558.00[9] |
| Create Privilege Log | Counsel will create a privilege log, which will be provided to opposing counsel | Six hours of attorney time x $185.00 per hour = $1,110.00 [10] |
| Prepare for Production and Produce | Counsel will bates stamp the nonprivileged responsive materials, export the nonprivileged responsive materials, and provide them to opposing counsel | Two hours of attorney time x $185.00 per hour = $370.00[11] |
|  | **TOTAL COSTS:** | **$127,653.00** |

---

[6] See Exhibit 3; see also Data Extraction Services Quote, attached as Exhibit 10.
[7] See Nextpoint Statement of Work, attached as Exhibit 11.
[8] See Exhibit 5, at ¶ 10.
[9] See Exhibit 6, at p 3.
[10] See Exhibit 5, at ¶ 17.
[11] See Exhibit 5, at ¶ 18.

As indicated above, the total expense to DDA is expected to be approximately $127,653.00.  This includes $21,875.00 in costs and approximately $105,778.00 in attorney's fees.   While DDA recognizes nonparties are not typically allowed to shift the legal fees they incur when conducting privilege reviews (*Hennigan*, 2012 WL 13005370 at 2), this is *not* a usual request and *not* a typical litigant.  First, the Subpoena was directed at (among others) general counsel for DDA and requests materials obviously relating to years of litigation with DDA in multiple forums.  In other words, Williams *must* have known the information responsive to the requests would necessarily include *substantial* privileged materials, which require extensive review prior to production.   Second, those having served the Subpoena – Williams and Paterson – are not typical litigants. Indeed, Paterson and his clients (including Williams) have an extensive history of sanctionable conduct in this case and many others (discussed below).  Given this, while DDA did not ask Williams to pay its entire expense, DDA did ask Williams to pay the $21,875.00 in costs and $26,444.50 (25%) of its attorney's fees.  This equals less than 40% of the aggregate expense DDA will incur.  (Id.).   But Williams has not agreed.  (Id.).  This Court should order him to do so.

Finally, this Court should order Williams to pay his portion of the expense of production *before* DDA is obligated to undertake further efforts to comply with the Order. As the Sixth Circuit once noted regarding Andrew Paterson and another

client (who is currently his "Law Clerk"), "we find it important to note that [Robert Davis] and his attorney, Andrew Paterson, have a prolific history litigating cases in Michigan state courts and federal courts. Their filings could be defined, in many instances, as repetitive, vexatious, and frivolous." *Davis v Johnson*, 664 F App'x 446, 450 (6th Cir. 2016). Indeed, Paterson and his clients have been sanctioned so many times it is hard to comprehend:

| Case Name | Description of Sanctions Event |
|---|---|
| *Davis v Highland Park Board of Education* | Judge MacDonald found that the suit brought by Paterson, as counsel for the plaintiff, was frivolous and brought solely to harass the school district pursuant to MCR 2.625(A)(2) and MCL 600.2591, and ordered fees and costs of approximately $40,000. |
| *Citizens United v NERD* | Judge Jamo issued an Order awarding defendants "their costs, expenses, and reasonable attorney fees," against Paterson, who represented the plaintiff. Paterson did not pay. |
| *White v Detroit Election Commission* | Judge Fresard entered an Order Imposing Sanctions against Paterson and one of the plaintiffs, Robert Davis, jointly and severally, in a total amount of $11,587.67. |
| *Davis v Highland Park Board of Education* | Order reversing Judge MacDonald's denial of judgment against Paterson, and remanding for entry of a judgment against Paterson for fees and costs previously awarded for filing a frivolous suit. |
| *Richards v Wayne County Airport Authority* | Court of Appeals affirmed the Wayne County Circuit Court's finding that Paterson filed a frivolous claim and awarding attorney fees and costs against Paterson for bringing a third case against the defendant arising out of the same facts of two prior cases |
| *Davis v Highland Park Board of Education* | Order finding Paterson's appeal was vexatious pursuant to MCR 7.216(C), and remanded for an evidentiary hearing on the actual damages, including, attorneys' fees and costs. |
| *Davis v* | Judge MacDonald entered a Judgment Against Paterson |

| | |
|---|---|
| *Highland Park Board of Education* | Awarding Attorney Fees and Costs to Defendants for Frivolous Proceeding in the amount of $40,356.60. |
| *Citizens United v NERD* | Judge Jamo issued an Opinion and Order establishing the attorney fees owed by Paterson, which totaled $45,338.63. |
| *Davis v Garrell* | Judge Colombo, after a show cause hearing, dismissed the complaint and expressly found that plaintiff's claims violated MCR 2.114, and provided time for a motion for sanctions to be filed. Paterson represented the plaintiff. |
| *Davis v Johnson* | Paterson represented plaintiff. Judge Tarnow granted defendant Judge Robert Colombo's motion to dismiss, quoting: 'A district court may, at any time, sua sponte dismiss a complaint for lack of subject matter jurisdiction pursuant to Rule 12(b)(1)... when the allegations of a complaint are totally implausible, attenuated, unsubstantiated, frivolous, devoid of merit, or no longer open to discussion.' (citation omitted). |
| *Davis v Johnson* | The Court issued an Opinion emphasizing that, "Plaintiff Robert Davis and his attorney, Andrew Paterson [Paterson], have a prolific history litigating cases in Michigan state and federal courts. Their filings could be defined, in many instances, as repetitive, vexatious, and frivolous." |
| *Citizens United v NERD* | Judge Jamo issued an "Order to Show Cause Why Andrew Paterson Should Not Be Held in Civil Contempt" for failing to pay the sanctions, after the Court provided additional time to resolve the issue. |
| *Detroit Downtown Development Authority v Lotus* | Judge Burton entered an order granting sanctions against Paterson and his clients **(including Williams)**, the plaintiffs, jointly and severally. |

| | |
|---|---|
| *Detroit Downtown Development Authority v Lotus* | Judge Burton issued an Opinion denying Paterson's motion to disqualify Judge Burton finding, in part:<br><br>Quite simply, Attorney Paterson [Paterson] is forum shopping for a judge who will never disagree or rule against his client.<br><br>\*     \*     \*<br><br>... defendants' motion to disqualify... is procedurally defective and substantively lacking in factual and legal support.<br><br>Judge Burton found that sanctions against Paterson were warranted. |
| *Davis* v *Garrell* | Judge Colombo entered a Stipulated Order requiring Paterson to pay $100 monthly towards the prior judgment amount to defendant's counsel to hold pending plaintiffs appeal, and if the appeal was denied, defendant's counsel was to disburse all funds to the City of Detroit. |
| *Detroit Downtown Development Authority* v *Lotus* | Judge Colombo issued an Order Granting Plaintiffs' Motion for Sanctions assessing sanctions against Paterson and his clients (**including Williams**), jointly and severally and Mr. Davis, jointly and severally. |
| *Davis* v *Robert* | Judge Goldsmith, after granting defendant Sue Hall summary judgment, ordered the plaintiff, who was represented by Paterson, to pay costs of $687.50 for court reporter fees to defendant Hall by November 16, 2017 |
| *Detroit Downtown Development Authority* v | Judge Colombo, following his grant of the October 10, 2017 motion for award of attorney fees and costs against Paterson and his clients and assessment of sanctions against them, jointly and severally, entered Judgment against Paterson and his clients (**including Williams**), jointly and severally, in the total amount of $17,860.20. |

13

| | |
|---|---|
| *Detroit Downtown Development Authority v Lotus* | Order entered:<br><br>[F]ind[ing] that Attorney Paterson signed the motion for immediate consideration without first making reasonable inquiry, and from that we must conclude that the document was filed for an improper purpose to harass or to cause needless increase in the cost of litigation. Consequently, on the Court's own motion, Andrew Paterson [Paterson] is directed to pay to this Court $500, as an appropriate sanction, within 28 days of this order." (Emphasis added). |
| *Davis v Detroit Downtown Development Authority,* | Judge Goldsmith issued an Opinion and Order granting in part (and denying in part) defendants' various motions for sanctions against the plaintiffs (whom Paterson represented) for bringing frivolous claims and filing a motion to strike. Defendants were to file affidavits setting forth the fees and costs incurred in responding to the frivolous matters. |
| *Citizens United v NERD* | Judge Jamo issued an Order Finding Andrew A. Paterson, Jr., in Civil Contempt of Court, which set forth the sanction history beginning with the Court's December 13, 2013 Order for Paterson to pay attorney fees, etc., and finding that based on Paterson's admissions, Paterson had the means to tender some amount of payment pursuant to the February 25, 2015 order, but failed to do so. The Court ordered Paterson to comply with an installment payment plan, with possible incarceration for failure to pay. Paterson was ordered to submit to a deposition by May 30, 2018, regarding his finances to establish the installment payment plan. |
| *Citizens United v NERD* | Paterson's deposition was taken pursuant to the April 2, 2018 order (above), after being duly noticed, but Paterson did not produce the requested documents. Notably, Paterson testified that there was only one outstanding unpaid sanction award against him, which |

14

| | does not appear to be an accurate statement based on this chronology. |
|---|---|
| *Detroit Downtown Development Authority v Lotus* | Judge Burton entered an Amended Judgment against Paterson and his clients **(including Williams)** after they all failed to comply with his August 11, 2017 order sanctioning them, for a total amount of $4,814.65. |
| *Detroit Downtown Development Authority v Lotus* | Judge Colombo entered as Order Granting Sanctions against Andrew Paterson in Favor of City of Detroit Downtown Development Authority sanctioning Paterson for failing to appear at the settlement conference and for failing to timely file a response to a motion. |
| *Lotus v Downtown Development Authority* | Judge Michelson issued an Opinion and Order finding, in part: |

Judge Michelson issued an Opinion and Order finding, in part:

> ... the repeated misrepresentations by Plaintiff's counsel [Paterson] and the Plaintiffs' **[including Williams]** failures to comply with discovery orders -despite warnings and imposition of less severe sanctions- warrant the dismissal of Plaintiff s claims against the DDA as a discovery sanction.
>
>     \*        \*        \*
>
> Unfortunately, neither the Plaintiffs **[including Williams]** nor Paterson [Paterson] have been forthright with the Court. Paterson [Paterson] offered shifting and unpersuasive explanations for his clients' failure to provide audit records.... Worse still, [Paterson's] response states, '...individual Plaintiffs **[including Williams]** have paid the sanctions judgment entered by the Court in the amount of $3,957.' (citation omitted). But, at the time the DDA filed the motion…, Plaintiffs had

15

| | |
|---|---|
| | not yet paid the sanctions. So, the Plaintiffs **[including Williams]** are the ones making misleading and false statements.<br><br>&ast;  &ast;  &ast;<br><br>All told, in two years, Plaintiffs **[including Williams]** and their counsel [Paterson] have violated three of the Court's discovery orders, ignored the Federal Rules of Civil Procedure, and have been less than honest in their representations to the Court. Their behavior goes beyond mere violation of the local rules or dilatory tactics. (Emphasis added).<br><br>Judge Michelson dismissed plaintiffs' claims against the DDA. |
| *Davis v Detroit Downtown Development Authority* | Judge Goldsmith, pursuant to his January 26, 2018 Opinion (above), issued an Opinion and Order Imposing Sanctions in the amount of $13,506 against Paterson, only, stating:<br><br>[T]he Court finds that this amount of sanctions is sufficient to punish and deter Plaintiff's counsel [Paterson] from further frivolous filings. It represents the amount of work put in by eight attorneys across two firms, solely to respond to claims and filings that Plaintiff's counsel [Paterson] should have known were frivolous. Plaintiff's counsel [Paterson] should consider this figure before attempting to file any future frivolous claims.<br><br>Paterson's payment was due November 27, 2018. |
| *Lotus v Dennis* | Mag. Judge Patti issued an Order quashing |

| | |
|---|---|
| *Archer* | Paterson's subpoenas and finding that defendant had established prejudice based on plaintiffs "frequent and repeated discovery abuses." Paterson represented the plaintiff. |
| *Carmack v City of Detroit* | Judge Goldsmith made the following comments regarding Paterson, who represents the plaintiff, during oral argument on defendants' motions to dismiss:<br><br>...I have very serious concerns about how this case has been prosecuted. I don't mean to be personally critical but I have concerns about the withholding of concurrence. I have concerns about how the state court discovery machinery was used in - with the background of my written order. I have concerns about attempts to influence a party to this case through potentially improper means. I have concerns about whether, at the time the complaint was filed, there was sufficient investigation done to confirm the factual allegations and legal claims had a reasonable basis. |
| *Davis v Detroit Downtown Development Authority* | Judge Goldsmith issued an order to show cause why Paterson should not be held in contempt of court for failing to pay the $13,506 sanction awarded against him on November 6, 2018. |
| *Davis v City of Detroit* | Judge Ewell issued an Opinion dismissing the Amended Complaint filed by Paterson and ordered sanctions against Plaintiff for conduct engaged in by Paterson, including filing the Complaint and Amended Complaint, which were frivolous and intended to harass the City of Detroit. Paterson was actively involved in the conduct underlying the Amended Complaint, as fully set forth in the Opinion. |
| *City of Detroit v Carmack's* | Judge Donald Coleman entered a Stipulated Order Denying Defendant's Emergency Motion to Compel |

| *Collision* | Depositions, Granting Plaintiff's Motions for Sanctions and Setting Hearing Date. Paterson is co-counsel for the defendant. Defendant was ordered to pay $1,500 for discovery abuses. The transcript (not yet available) will show that the discovery abuses included the issuance of unauthorized subpoenas to various City of Detroit former and/or current personnel and that Paterson admitted he was responsible for them. |
|---|---|

Significantly, nearly all (if not all) of the above sanctions awards remain unpaid. In fact, just last week, Judge Goldsmith entered a revealing order after Paterson failed to pay a $13,506.00 sanctions order to DDA, which was imposed on Paterson nearly six months ago:

### ORDER REGARDING CONTEMPT PROCEEDINGS

On November 6, 2018, this Court entered an opinion and order imposing sanctions on Plaintiffs' counsel, Andrew Paterson. 11/6/2018 Op. & Order (Dkt. 107). Mr. Paterson has failed to pay the sanctions ordered, claiming belatedly, after Defendants sought to hold him in contempt, that he is unable to do so. As stated at the April 11, 2019 hearing, the Court orders as follows:

- The parties shall confer in an attempt to come to an agreeable solution as to the payment that the Court has ordered.

- If the parties cannot reach agreement by April 18, 2019, Defendants will have thirty days to take discovery regarding Mr. Paterson's ability to pay. They may issue document requests, to which Mr. Paterson must respond and produce documents within ten days of being served. They may also serve third-party subpoenas and require that Mr. Paterson undergo a creditor's examination. Defendants' discovery may seek any and all information and records pertaining to Mr. Paterson's financial condition as to assets, liabilities, income and expenses, going back three years, including without limitation, tax returns, related tax documents, financial journals and ledgers, credit card and bank statements, and real property records. The requests may encompass both his personal records and the records of any trust of which he is a beneficiary and any business entity in which he is a principal, partner or shareholder. If Defendants determine that the thirty-day period is insufficient, they may continue discovery for another thirty days without seeking leave of court.

- After discovery is complete, Defendants shall have ten days to file a brief regarding the actions they would like the Court to take, citing appropriate authority. Mr. Paterson shall

file a response within ten days after service of Defendants' brief.

- If Defendants believe that the issue of Mr. Paterson's ability to pay has no bearing on this Court's authority to incarcerate him as part of a civil contempt process to compel compliance with the Court's order or to permanently bar him from practice in the Eastern District of Michigan as a sanction for noncompliance, they may file a brief setting forth their position. The brief must be filed no later than May 10, 2019. Mr. Paterson will then have one week to file a response.

SO ORDERED.

Dated: April 12, 2019                          s/Mark A. Goldsmith
      Detroit, Michigan                     MARK A. GOLDSMITH
                                United States District Judge

(See 4/12/19, Order, attached as Exhibit 12).

Given this, it is entirely reasonable for the Court to order Williams and Paterson to pay DDA their share of the expense of production before DDA is obligated to undertake further efforts to comply with the Order. Otherwise, DDA will inevitably be placed in the unenviable position of – again – becoming an unpaid creditor of Paterson and his clients' contumacious disregard for court orders directing them to pay money. But this time as a *nonparty* forced to incur *$127,653.00 in expenses* to comply with an Order, which Paterson and Williams will certainly disregard. Accordingly, this Court should order Williams and Paterson to pay DDA their share of the expense of production before DDA is obligated to undertake further efforts to comply with the order.

WHEREFORE, Respondent City of Detroit Downtown Development Authority, respectfully requests that, this Court grant its Motion for a Protective Order in Connection with the Court's [119] Order Granting in Part and Denying in Part Christopher William's Motion to Compel.

Respectfully submitted,

**KOTZ SANGSTER WYSOCKI P.C.**

Dated: April 19, 2019          By:     /s/ Jeffrey M. Sangster____

Jeffrey M. Sangster (P30791)
Anthony M. Sciara (P75778)
Counsel for Respondent DDA

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

LOTUS INDUSTRIES, LLC D/B/A
CENTRE PARK BAR; CHRISTOPHER
WILLIAMS; ROBERT DAVIS; and
A FELON'S CRUSADE FOR
EQUALITY, HONESTY, AND
TRUTH,

     Plaintiffs,

  v.

CITY OF DETROIT; DENNIS
ARCHER JR.; IGNITION MEDIA;
TOTAL OUTDOOR; and RUTH
JOHNSON,

     Defendants.

and

CITY OF DETROIT DOWNTOWN
DEVELOPMENT AUTHORITY,

     Respondent.

Case No. 2:17-cv-13482
Hon. Sean F. Cox
Mag. Anthony P. Patti

---

**PATERSON LAW FIRM**
By: Andrew A. Paterson (P18690)
Counsel for Plaintiffs
2893 East Eisenhower Parkway
Ann Arbor, Michigan 48108
(248) 568-9712
aap43@outlook.com

**KOTZ SANGSTER WYSOCKI P.C.**
By: Jeffrey M. Sangster (P30791)
    Anthony M. Sciara (P75778)
Counsel for Respondent DDA
400 Renaissance Center
Suite 3400
Detroit, Michigan 48243
313-259-8300
jsangster@kotzsangster.com
asciara@kotzsangster.com

---

| | |
|---|---|
| **HONIGMAN LLP** | **CITY OF DETROIT LAW** |
| By: Raymond W. Henney (P35860) | **DEPARTMENT** |
|     Derek R. Mullins (P81422) | By:  James D. Noseda (P52563) |
| Counsel for Dennis Archer, Jr. and | Counsel for City of Detroit |
| Ignition Media | 2 Woodward Avenue, 5th Floor |
| 600 Woodward Avenue | Detroit, Michigan 48226 |
| Suite 2290 | (313) 224-4550 |
| Detroit, Michigan 48226 | nosej@detroitmi.gov |
| 313-465-7312 | |
| rhenney@honigman.com | |
| dmullins@honigman.com | |

## CERTIFICATE OF SERVICE

I hereby certify that, to the best of my information, knowledge, and belief, and on the 19th day of April, 2019, I electronically filed the foregoing pleadings with the Clerk of the Court using the ECF system, which will send notification of, and serve, such filing to all counsel of record.

/s/ Lindsey Pfund

# EXHIBIT 1

## Pfund, Lindsey E.

| | |
|---|---|
| **Sent:** | Friday, April 19, 2019 10:15 AM |
| **To:** | 'Drew Paterson' |
| **Cc:** | Sangster, Jeffrey M.; Clark, Ashley D.; Clark, Ashley D.; Clark, Ashley D. |
| **Subject:** | RE: Christopher Williams, et al. v. Dennis Archer, Jr., et al. - Order Granting In Part and Denying In Part Christopher Williams's Motion to Compel (as to DDA) |

Mr. Paterson:

In follow up to our call this morning.

We discussed DDA's need for an extension of time for production because of the substantial volume of data DDA has discovered is involved. While you did not agree to a specific extension of time, you indicated understanding that some degree of an extension is necessary.

We also discussed the cost-shifting portion of our anticipated motion. We did not reach agreement, but did agree to continue discussing the matter so as to determine whether we can reach any agreements in the future. You indicated that, while you do not agree with the relief sought, you understood the motion would be filed and Judge Patti's resolution is likely to be necessary.

In accordance with Judge Patti's guidelines, we will continue discussing this matter before any hearing.

Thanks,
Anthony

**From:** Sciara, Anthony M.
**Sent:** Friday, April 19, 2019 9:19 AM
**To:** 'Drew Paterson'
**Cc:** Sangster, Jeffrey M.; Clark, Ashley D.; Clark, Ashley D.; Clark, Ashley D.
**Subject:** RE: Christopher Williams, et al. v. Dennis Archer, Jr., et al. - Order Granting In Part and Denying In Part Christopher Williams's Motion to Compel (as to DDA)

Mr. Paterson:

I will call you at 10:00 a.m. at 248-568-9712.

Thanks,
Anthony

**From:** Drew Paterson [mailto:aap43@outlook.com]
**Sent:** Friday, April 19, 2019 9:16 AM
**To:** Sciara, Anthony M.
**Cc:** Sangster, Jeffrey M.; Clark, Ashley D.; Clark, Ashley D.
**Subject:** Re: Christopher Williams, et al. v. Dennis Archer, Jr., et al. - Order Granting In Part and Denying In Part Christopher Williams's Motion to Compel (as to DDA)

Counsel:
I'm available for a teleconference this morning between 10am-11am or this afternoon between 2pm-3pm. Please advise to your availability.

Drew Paterson
(248) 568-9712
aap43@outlook.com

**From:** Sciara, Anthony M.
**Sent:** Friday, April 19, 2019 9:07:17 AM
**To:** 'Drew Paterson'
**Cc:** Sangster, Jeffrey M.; Clark, Ashley D.; Clark, Ashley D.
**Subject:** RE: Christopher Williams, et al. v. Dennis Archer, Jr., et al. - Order Granting In Part and Denying In Part Christopher Williams's Motion to Compel (as to DDA)

Mr. Paterson:

If we are unable to reach an agreement, DDA will file a motion for a protective order, which asks the Court:

a) for additional time to comply with its order; and

b) to order Christopher Williams to pay a reasonable portion of the significant expense of compliance before DDA undertakes further efforts to comply with the order.

Judge Patti's practice guidelines, and his statements in court, instruct us to discuss the potential motion in-person or by telephone before such a motion is filed. We are attempting to comply with those instructions by having a telephone conversation to discuss the issues and determine whether a motion is necessary.

Please let me know your availability for a call today?

Thanks,
Anthony



**Anthony M. Sciara | Senior Counsel**
Kotz Sangster Wysocki P.C.
400 Renaissance Center | Suite 3400
Detroit, Michigan 48243
313.259.8633 Direct
313.259.8300 Main
www.kotzsangster.com

NOTICE: The information contained in this email message is confidential, intended solely for the use of the individual or entity named as addressee and is protected by law from discovery. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination, distribution, copying or unauthorized use of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by telephone and return this message to the sender at the above address via the United States Postal Service. Thank you.

**From:** Drew Paterson [mailto:aap43@outlook.com]
**Sent:** Thursday, April 18, 2019 7:34 PM
**To:** Sciara, Anthony M.
**Cc:** Sangster, Jeffrey M.; Clark, Ashley D.
**Subject:** Re: Christopher Williams, et al. v. Dennis Archer, Jr., et al. - Order Granting In Part and Denying In Part Christopher Williams's Motion to Compel (as to DDA)

Counsel:
What will be the basis of such a motion?

Drew Paterson
(248) 568-9712
aap43@outlook.com

**From:** Sciara, Anthony M.
**Sent:** Thursday, April 18, 2019 1:01:50 PM
**To:** 'Drew Paterson'
**Cc:** Sangster, Jeffrey M.; Clark, Ashley D.
**Subject:** Christopher Williams, et al. v. Dennis Archer, Jr., et al. - Order Granting In Part and Denying In Part Christopher Williams's Motion to Compel (as to DDA)

Mr. Paterson:

We are considering filing a motion for protective order in connection with Judge Patti's (attached) Order Granting In Part and Denying In Part Christopher Williams's Motion to Compel (as to DDA).

In accordance with Local Rule 7.1, and Judge Patti's Practice Guidelines, we request a conversation regarding this matter.

Please let me know your availability today or tomorrow for a telephone call?

Thanks,
Anthony



**Anthony M. Sciara | Senior Counsel**
Kotz Sangster Wysocki P.C.
400 Renaissance Center | Suite 3400
Detroit, Michigan 48243
313.259.8633 Direct
313.259.8300 Main
www.kotzsangster.com

NOTICE: The information contained in this email message is confidential, intended solely for the use of the individual or entity named as addressee and is protected by law from discovery. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination, distribution, copying or unauthorized use of this communication is

strictly prohibited. If you have received this communication in error, please immediately notify the sender by telephone and return this message to the sender at the above address via the United States Postal Service. Thank you.

# EXHIBIT 2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LOTUS INDUSTRIES, LLC,
et al.,

                Plaintiffs,

v.

DENNIS ARCHER, Jr., et al.

                Defendants.
_____/

Case No. 2:17-cv-13482
District Judge Sean F. Cox
Magistrate Judge Anthony P. Patti

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF
CHRISTOPHER WILLIAMS' MOTION TO COMPEL NONPARTY
DETROIT DOWNTOWN DEVELOPMENT AUTHORITY TO PRODUCE
DOCUMENTS REQUESTED IN SEPTEMBER 13, 2018 SUBPOENA
PURSUANT TO FED. R. CIV. P. 37 (DE 111)**

This matter is before the Court for consideration of Plaintiff Christopher

Williams' motion to compel nonparty Detroit Downtown Development Authority

to produce documents requested in September 13, 2018 subpoena pursuant to Fed.

R. Civ. P. 37 (DE 111), City of Detroit Downtown Development Authority's

(DDA) response (DE 114), and Plaintiff Williams' statement of resolved and

unresolved issues (DE 116). All discovery matters have been referred to me for

hearing and determination (DE 102), and a hearing was held on March 26, 2019, at

which counsel appeared and the Court entertained oral argument regarding

Plaintiff's motion.

Upon consideration of the motion papers, and for all the reasons stated by

the Court on the record, which are hereby incorporated by reference as though

fully restated herein, Plaintiff's motion to compel the DDA to produce documents

responsive to the subpoena (DE 111) is **GRANTED IN PART AND DENIED IN**

**PART** as follows:

1. Nonparty DDA's general objections are considered waived and
   accordingly will not be considered by the Court. *See Wesley Corp. v.
   Zoom T.V. Products, LLC,* No. 17-10021, 2018 WL 372700, at *4 (E.D.
   Mich. Jan. 11, 2018) (Cleland, J.); *Siser N. Am., Inc. v. Herika G. Inc.*,
   325 F.R.D. 200, 209-10 (E.D. Mich. 2018) ("Boilerplate objections are
   legally meaningless and amount to a waiver of an objection.") (Davis,
   M.J.).

2. Plaintiff's motion to compel as to **Request Nos. 1-3** and **7-13** is
   **DENIED** for the reasons stated on the record, including that the
   documents sought are not relevant to the sole remaining claim in this case
   that Defendant Archer, Jr. retaliated against Plaintiff after Plaintiff and
   Lotus Industries "expressed their concerns" in a November 19, 2016
   Detroit Free Press article "with respect to the tainted bidding process that
   led to [DDA] awarding … Archer the right to own and develop Centre
   Park Bar." (DE 1 ¶ 38.) Request Nos. 1-3 and 7-12 seek documents
   relating to events that occurred long before Plaintiff's alleged protected
   activity on November 19, 2016—as admitted by Plaintiff's counsel at the
   hearing—and Plaintiff has not otherwise shown how the requested
   discovery "has any tendency to make a fact more or less probable than it
   would be without the evidence." Fed. R. Evid. 401(a). The Court also
   finds that these requests are too broad in scope and that it would be
   unduly burdensome to comply with them, especially for a nonparty.
   Moreover, Plaintiff's counsel admitted on the record that he is "not sure
   how [Request No. 12] fits" within the context of the remaining claim.

3. Plaintiff's motion to compel as to **Request Nos. 4-6** is **DENIED** to the extent these requests seek documents <u>prior to</u> November 19, 2016, because such documents are not relevant. However, Plaintiff's motion is **GRANTED** to the extent **Request Nos. 4-6** seek documents dated November 19, 2016 to the present. Responsive documents must be produced by **April 26, 2019**. If DDA withholds any documents from production on the basis of privilege, it must produce a privilege log as required by Fed. R. Civ. P. 45(e)(2)(A).

4. Nonparty DDA stated in its objections to the subpoena and in its response brief before the Court that the instant subpoena is "nothing more than a transparent attempt to circumvent Judge Michelson's discovery closure order" in *Lotus Industries, LLC, et al. v. Michael Duggan, et al.*, No. 16-cv-14112, and to seek discovery in this case that it can use in the case before Judge Michelson—in effect an end-run around Judge Michelson's order. (DE 114 at 16.) When given an opportunity to address this argument at the hearing, Plaintiff's counsel not only failed to dispute this contention but in fact confirmed his intent to do just that. Consistent with the protective order previously entered by this Court (DE 88 at 3), <u>the use and disclosure of discovery materials, specifically including the documents produced pursuant to this Order, is limited to</u> **this lawsuit only**.

Finally, I decline to award fees or costs to either side. Pursuant to Federal Rule of Civil Procedure 45(d)(1), the Court has discretion to impose "an appropriate sanction" on a party or attorney who fails to comply with their duty to "take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d)(1). Here, both sides' positions were substantially justified and required rulings from the Court. In addition, neither party fully prevailed. As such, an award of costs in this matter would neither be appropriate, nor just.

3

**IT IS SO ORDERED.**

Dated: March 27, 2019

s/*Anthony P. Patti*

Anthony P. Patti
UNITED STATES MAGISTRATE JUDGE

### Certificate of Service

I hereby certify that a copy of the foregoing document was sent to parties of record on March 27, 2019, electronically and/or by U.S. Mail.

s/Michael Williams

Case Manager for the
Honorable Anthony P. Patti

# EXHIBIT 3

## RE: DDA - Lotus (Third-Party Subpoena from Parallel Case)

Paul Kako <pkako@degc.org>

🕚 You replied to this message on 4/10/2019 2:57 PM.

Sent: Wed 4/10/2019 1:11 PM

To: Johnson, Mark F.C.

Cc: Sciara, Anthony M.; Clark, Ashley D.; Pfund, Lindsey E.

Good afternoon Mark,

Our IT vendor was able to access the three email accounts from November 19, 2016 to today's date and has indicated that the total usage for the three accounts is roughly 48.5 GB factoring in only email. It will be around 50-51 GB if we factor in contacts, calendars, and other items associated with the mailboxes. Please let me know if this information is sufficient or if you need anything else.

Paul Kako
Associate General Counsel
Detroit Economic Growth Corporation
500 Griswold Street, Suite 2200
Detroit, MI 48226
(313) 237-6099 (phone)
pkako@degc.org (e-mail)

# EXHIBIT 4

## RE: DDA - Lotus (Third-Party Subpoena from Parallel Case)

Paul Kako <pkako@degc.org>

🛈 You replied to this message on 4/16/2019 3:52 PM.
This message is part of a tracked conversation. Click here to find all related messages or to open the original flagged message.

Sent:   Tue 4/16/2019 3:48 PM
To:     Johnson, Mark F.C.
Cc      Sciara, Anthony M.; Clark, Ashley D.; Pfund, Lindsey E.

Mark,

After discussing the matter with our IT staff, we have determined that the 48.5 gigabytes of data from November 19, 2016 to April 10, 2019 is comprised of approximately 121,264 files in the inboxes of Rebecca Navin, Mark Denson, and Moddie Turay. Please let me know if you need anything else.



**D E G C**

**Paul J. Kako**
Associate General Counsel

**Detroit Economic Growth Corporation**
500 Griswold St.   Ste. 2200   Detroit, MI 48226
**O** 313.237.6099 **E** pkako@degc.org

degc.org

# EXHIBIT 5

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

LOTUS INDUSTRIES, LLC D/B/A
CENTRE PARK BAR; CHRISTOPHER
WILLIAMS; ROBERT DAVIS; and
A FELON'S CRUSADE FOR
EQUALITY, HONESTY, AND
TRUTH,

      Plaintiffs,

v.

CITY OF DETROIT; DENNIS
ARCHER JR.; IGNITION MEDIA;
TOTAL OUTDOOR; and RUTH
JOHNSON,

      Defendants.

and

CITY OF DETROIT DOWNTOWN
DEVELOPMENT AUTHORITY,

      Respondent.

Case No. 2:17-cv-13482
Hon. Sean F. Cox
Mag. Anthony P. Patti

**AFFIDAVIT OF
MARK F.C. JOHNSON**

*Kotz Sangster Wysocki P.C. Attorneys and Counselors at Law*

---

**PATERSON LAW FIRM**
By: Andrew A. Paterson
(P18690)
Counsel for Plaintiffs
2893 East Eisenhower Parkway
Ann Arbor, Michigan 48108
(248) 568-9712
aap43@outlook.com

**KOTZ SANGSTER WYSOCKI P.C.**
By: Jeffrey M. Sangster (P30791)
    Anthony M. Sciara (P75778)
Counsel for Respondent DDA
400 Renaissance Center
Suite 3400
Detroit, Michigan 48243
313-259-8300
jsangster@kotzsangster.com
  asciara@kotzsangster.com

---

1

**HONIGMAN LLP**
By: Raymond W. Henney (P35860)
      Derek R. Mullins (P81422)
Counsel for Dennis Archer, Jr. and
Ignition Media
600 Woodward Avenue
Suite 2290
Detroit, Michigan 48226
313-465-7312
rhenney@honigman.com
dmullins@honigman.com

**CITY OF DETROIT LAW
DEPARTMENT**
By:  James D. Noseda (P52563)
Counsel for City of Detroit
2 Woodward Avenue, 5th Floor
Detroit, Michigan 48226
(313) 224-4550
nosej@detroitmi.gov

## AFFIDAVIT OF MARK F.C. JOHNSON

I, Mark F.C. Johnson, being duly sworn, depose and state as follows:

1.    I am an attorney at law, licensed to practice in the State of Michigan, and employed by the firm Kotz Sangster Wysocki P.C.

2.    I am in good standing and of sound mind to testify competently as to the matters below.

3.    I base this affidavit on personal knowledge and can testify to the matters contained in this Affidavit if I am called to do so.

4.    I have been licensed to practice law in the State of Michigan since 2016.

5.    My hourly billable rate is $185.00 for legal services rendered.

6. In connection with a non-party subpoena issued in the above-captioned case, the law firm of Kotz Sangster Wysocki P.C. was retained to provide legal services on behalf of City of Detroit Downtown Development Authority ("DDA").

7. Over the past few years, I have managed several document reviews like the one DDA will need to perform to properly respond to the non-party subpoena issued to DDA by Christopher Williams.

8. Presently, there are approximately 48.5 GB of e-mail communications and attachments that must be reviewed, which consists of approximately 121,264 e-mail communications and attachments.

9. Applying "search terms" should help us eliminate roughly 50% of the original data set, decreasing the number of e-mails and attachments that must be reviewed to approximately 60,500.

10. Developing the search terms necessary to identify and segregate responsive information, and running those search terms against the entire 48.5 GB data set will take approximately four (4) hours of my time.

11. Even if applying "search terms" helped DDA eliminate 50% of the original 48.5 GB of data (thereby decreasing the number of e-mails and attachments that must be reviewed to approximately 60,500), understanding that an attorney can review, on average, 35-documents-per-hour in a privilege

3

review of this nature, completing this review will still require a team of multiple attorneys to expend a great deal of time.

12.    I have worked with Lumen Legal on numerous document-review projects over the past three years.

13.    Lumen Legal is a reputable, third-party vendor that routinely handles document-review projects like the one necessitated by the non-party subpoena issued to DDA by Christopher Williams.

14.    Based on diligent vetting I have conducted, I have found the fees and costs charged by Lumen Legal are reasonable and very competitive.

15.    Based on a Statement of Work provided by Lumen Legal, it would take a team of multiple attorneys approximately 11 weeks (54 business days/78 calendar days) to finish reviewing 60,500 documents.

16.    According to the Statement of Work provided by Lumen Legal, that work would cost approximately $103,558.00.

17.    After the team of multiple attorneys finishes reviewing and coding the documents, it would take me approximately six (6) hours to develop the privilege log itemizing the e-mails and/or attachments withheld as privileged under the attorney-client privilege or work-product doctrine.

18.    Finally, it would take me approximately two (2) hours to Bates stamp the responsive, non-privileged e-mails and attachments, export those

4

materials, and produce them to opposing counsel using Nextpoint (an e-Discovery hosting site utilized by our firm).

Further Affiant sayeth not.

/s/ Mark F.C. Johnson
Mark F.C. Johnson (P80539)

In accordance with 28 U.S.C. § 1746, I declare, certify, verify, and state, under penalty of perjury, that the foregoing is true and correct.

Executed on this 18th day of April, 2019.

Kotz Sangster Wysocki P. C. Attorneys and Counselors at Law

5

# EXHIBIT 6



**STATEMENT OF WORK**

**Document Review Services**

**THIS STATEMENT OF WORK** is effective as of April 18, 2019 ("Effective Date") and is subject to the terms and conditions of the Client Services Agreement between the parties dated December 7, 2018 (the "Agreement").  Any changes to the Agreement must be in writing and agreed upon by both parties.

1. **Primary Client Contact**

   - Mark Johnson
     Kotz Sangster Wysocki, PC
     Attorney
     mjohnson@kotzsangster.com
     313.259.8583

2. **Lumen Legal Account Service Team**

   - David Galbenski
     EVP of Strategic Initiatives
     dgalbenski@lumenlegal.com
     248.872.5533 (Mobile)

   - Jordan McCarter
     e-Discovery and Commercial Contracts Manager
     jmccarter@lumenlegal.com
     248.574.5802 (Direct Dial)

   - Scott Hund
     eDiscovery Project Manager
     shund@lumenlegal.com
     248.565.3493 (Direct Dial)

3. **Description of Services**

   Lumen Legal will provide Document Review Services as directed by Kotz Sangster Wysocki, PC.

   In the case of this engagement, Document Review Services include:  First Level Review Attorneys, Team Lead/QC Attorney(s), eDiscovery Project Manager, Facility, Computers and Printing of materials, as needed.

**Project Details**

- **Project Name:**  City of Detroit Downtown Development Authority ("DDA")
- **Project Location:**  Lumen Review Center, Troy, Michigan
- **Total Universe of Documents:**  Approximately 60,500 documents
- **Deadline for Project Completion:** Approximately 54 business working days (78 calendar days) from start of project
- **Types of Documents:** E-mail, Word, PowerPoint, Excel, etc.
- **Type of Review:**  Privilege & Privilege Log
- **Work Week:**  Anticipated 40 hours per week, Monday – Friday with no weekend work.
- **Language:**  English
- **Issues to Code:** 1 – 5 issues
- **Review Platform:** Nextpoint
- **Team Size:** 1 Project Manager, 1 Team Lead Attorney and 4 First Level Attorneys.
- **Conflicts Questions:** To be provided and approved by client
- **Technology Contact:** TBD
- **Accounting Contact:** Ashley Clark, 313.259.2352, aclark@kotzsangster.com
- **Time Approver:**  Lumen Project Manager

## 4.  Project Schedule & Quality Control (QC) Standard

**Estimated Start Date:**  May 20, 2019

**Estimated End Date:**   August 6, 2019

Lumen Legal Project Management, in its sole discretion and expertise, will determine the appropriate QC strategy and level for each project.  In making its determination, the Lumen Project Manager will take into account the details of each project.  If the client requests QC strategies or levels over and above what is provide by Lumen under its standard services, additional fees may apply.

Additionally, should a material change in the project scope take place which impacts the current QC strategy, the Lumen Legal Project Manager will contact the client as soon as possible to advise as to the impact on the project strategy and deliverables.

## 5.  Cancellation Notification Requirements & Lumen Standard Practices

In the event a scheduled work day must be canceled, the Lumen Legal primary contacts listed above must be notified by 5:00 p.m. ET on the day prior to the canceled work day to ensure that we can provide proper notice to our review team.  If Lumen Legal is not provided with notice by 5:00 p.m. ET on the day prior to the canceled work day, all team members will be paid and our client billed for a minimum of two (2) hours time on the canceled work day.

Once a regularly scheduled work day has commenced, if any issue arises that prevents the team from working on the project, Lumen Legal will promptly notify the primary client contact listed above in order to seek timely resolution of the issue.

After the issue is reported, the Lumen team will remain engaged and ready to work during the downtime.  All Lumen personnel will be paid and the client will be billed for all hours of downtime.

Lumen Legal will use its best efforts to keep the team in tact during unexpected downtime, however, extended downtime may lead to loss of experienced team members.

5. **Rates and Fees**

- First Level Review Attorney                          $45.50/hr.
- Team Lead/QC Attorney                               $45.50/hr.
- eDiscovery Project Manager                          $45.50/hr.
- Facility Fee                                        Waived
- Computer Fee                                        Waived
- Copy Services (B&W)                                 $0.30/page
- Extended Hours Multiplier (Weekend/Evening Work)    1.25

**Project Estimate Based Upon Assumptions and Rates Above:**

| Category | Number | Hourly Rate* | Estimated Hours** | Review Estimate |
|---|---|---|---|---|
|  |  |  |  |  |
| First Level Attorney | 4 | $45.50 | 1728 | $78,624 |
| Team Lead Attorney | 1 | $45.50 | 432 | $19,656 |
| Project Manager | 1 | $45.50 | 116 | $5,278 |
|  |  |  |  |  |
| **Total Review Estimate** |  |  |  | **$103,558** |

\* First level review attorney is billed at same rate due to all work being considered privilege review and creation of privilege log.

\*\* Based upon 35 documents reviewed per hour and a project length of 54 business working days (not calendar days).

**Note:**

- Lumen follows state wage and hour laws in the state in which the work will be performed.

- Any material changes in the scope of services detailed above could result in a change in rate(s) or fees.

- Training materials can be printed or copied by Lumen Legal and organized in a binder for each team member.  Please provide all

RV: 10.3.17

3

materials to the Lumen Legal contacts listed above twenty-four (24) hours prior to the project start to ensure adequate preparation time.

- o Standard rates for 8" x 11" copies: $0.30 per page for black & white (B&W) and $0.70 per page for color copies.

- The Lumen Review Center standard hours are Monday – Friday, 7:30 a.m. – 6:00 p.m. ET.

- Extended Hours: Upon request, additional hours beyond standard hours during the week, as well as weekend hours can be incorporated into the project scope in order to meet client deadlines.

- Should standard redaction work or privilege logging be requested, all work will be performed at the Team Lead/QC Attorney hourly rate.

**IN WITNESS WHEREOF**, the parties hereto acknowledge and agree that this Statement of Work shall not be effective or binding unless and until it has been accepted and signed by both parties.

**Lumen Legal**                                    **Kotz Sangster Wysocki, PC**

By:_____        By:_____

Name:_____.      Name:_____

Title:_____        Title:_____

Date:_____        Date:_____

# EXHIBIT 7

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GWENDOLYN WILLIAMS,
CHRISTOPHER WILLIANS,
KENNETH SCOTT BRIDGEWATER,
*et al.*,

      Plaintiffs,

v.

CITY OF DETROIT DOWNTOWN
DEVELOPMENT AUTHORITY,
*et al.*,

      Defendants.

Case No. 16-14112
Honorable Laurie J. Michelson
Magistrate Judge Anthony P. Patti

---

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT DDA'S MOTION TO DISMISS [189]**

---

Pursuant to a lease agreement with Defendant Detroit Development Authority ("DDA"), Plaintiffs operated the Centre Park Restaurant and Bar in an area of downtown Detroit that is being redeveloped. The bar owners wanted to participate in the redevelopment project. But their bid was rejected. They subsequently, and publicly, complained about the bid process. According to the bar owners, this led the City of Detroit to temporarily close the bar and the DDA to prematurely terminate their lease. So the bar owners, through their counsel Andrew Paterson, sued a host of City officials and City entities.

The litigation has been contentious. There have been repeated discovery abuses, including failures to produce requested information. This has resulted in many discovery disputes—ones that have come at significant cost to the DDA. So the DDA now moves to dismiss the bar owners' case as a discovery sanction, hold the bar owners in contempt, and urges the Court to conditionally incarcerate them.

While the conduct on both sides has been less than exemplary, the repeated misrepresentations by Plaintiffs' counsel and the Plaintiffs' failures to comply with discovery orders—despite warnings and the imposition of less severe sanctions—warrant the dismissal of Plaintiffs' claims against the DDA as a discovery sanction. But the Court rejects the DDA's invitation to hold the bar owners in contempt and incarcerate them. So for the reasons that follow, the Court GRANTS in part and DENIES in part the DDA's motion.

## I.

### A.

The lawsuit between the parties involves the DDA's plan to redevelop the Harmonie Park area in downtown Detroit. (R. 189, PageID.4250–4253.) The DDA requested development proposals. (*Id.* at PageID.4254–4264.) The Plaintiff owners wanted to participate in the redevelopment project and thereby stave off the relocation or closure of their bar. (*Id.* at PageID.4250–4251.) But they submitted their proposal 15 minutes late, and the DDA eventually rejected it as untimely (or, that is the DDA's position anyway). (*Id.* at PageID.4167.)

Upset by the rejection, the bar owners initially tried to work something out with redevelopment officials and staff from the Mayor's Office. They exchanged emails and attended meetings with City and redevelopment officials, but to no avail. (R. 189, PageID.4169–4187.) The bar owners then publicly complained about the fairness of the bidding process. (R. 1, PageID.10.) They believed that the DDA predetermined which proposals would be accepted and which would be rejected. (*Id.*)

According to Plaintiffs, their complaints resulted in retaliation by the City. They claim Detroit police officers started to show up, ticket the bar for noise ordinance violations, and order patrons to leave. (R. 1, PageID.10–11.) And at some point, Detroit police even shut down the bar

2

completely. (*Id.* at PageID.11.) Soon after, DDA officials told the bar owners they planned to terminate the bar's lease early. (*Id.*)

So the bar owners filed this lawsuit against the DDA, Mayor Duggan, and others, alleging several claims, including a Section 1983 claim of retaliation in violation of the bar owners' First Amendment rights. (R. 1, PageID.13.) Certain defendants were voluntarily dismissed, others answered, and the case moved to discovery. (R. 11, 12, 14, 22.)

**B.**

The discovery disputes had already started by the time of the initial Rule 16 scheduling conference. (R. 29.)

To understand the first dispute requires some background. In response to Plaintiffs' complaint, the DDA, as lessor of the space where Centre Park Bar was located, filed a counterclaim alleging numerous breaches of the lease by Plaintiffs.[1] (R. 16, PageID.227.) The DDA also initiated an audit of the bar's sales. (R. 39, PageID.544.) Specifically, the DDA wanted to know what percentage of the bar's total sales were liquor sales. (R. 44, PageID.634.) If the bar's sales were more than 40% liquor, the bar would be in breach of its lease agreement. (*Id.*) To make that determination, the DDA asked the bar owners to provide records showing total sales, liquor sales, and food sales. (*Id.*) But initially, the bar owners only provided a snapshot of sales. (R. 39, PageID.563, 565, 567, 570, 575, 581, 583, 585, 588, 590, 592.) By the time of the scheduling conference, the bar owners had still not provided a complete picture. (R. 44, PageID.639–640.) So

---

[1] As the parties were also engaged in related state court litigation involving lease issues, the court ultimately declined to exercise supplemental jurisdiction over the counterclaim. But it was part of the case for awhile and issues involving termination of the lease are also part of Plaintiffs' first amendment retaliation claim.

at the scheduling conference, the Court directed the owners (through counsel) to disclose all sales receipts as part of their initial disclosures. (*Id.*)

The DDA also served a request for the audit documents pursuant to Federal Rule of Civil Procedure 34. (R. 44, PageID.4324–4329.) Plaintiffs did not produce the audit records. So the DDA filed its first motion for an order to show cause. (R. 39.) And the Court held a hearing. (R. 41, 44.)

At the hearing, Paterson offered shifting explanations for the bar owners' lack of disclosure and failure to abide by Rule 34. Bottom line—Plaintiffs' counsel indicated the digital records were unavailable and possibly destroyed. (R. 44, PageID.649.) Nevertheless, he said the bar owners were working to assemble the documents. They had a "forensic computer investigator" and an "accountant" trying to unearth the digital records. (*Id.* at PageID.642, 645.) In response to questioning from the Court, Paterson acknowledged that paper records of the bar's sales were likely retrievable from the Michigan Liquor Control Commission. (*Id.* at PageID.641–642, 652, 663.) But he could not fully explain why the bar owners did not provide more complete receipts to the DDA. (*Id.* at PageID.649–650.)

As a result, in June 2017, the Court ordered Paterson to consult with his clients to "produce all requested audit documents" within 30 days, "request the relevant audit documents" from the Liquor Control Commission within 7 days, allow the DDA to depose the bar's general manager, accountant, and forensic computer analyst, and within 30 days pay the DDA's attorney fees for bringing the motion.[2] (R. 43, PageID.629–630.)

---

[2] Some weeks later, in a telephonic status conference held off the record, Paterson said there never was any accountant.

A few months later, another discovery dispute arose. (R. 58.) In May 2017, the DDA served on the bar owners a set of interrogatories and requests for production. (R. 189, PageID.4069.) Roughly a month later, the DDA served a second set. (*Id.* at PageID.4070.) Largely, the discovery requests sought business records from the bar and any documents upon which the bar owners based their legal claims against the DDA and others. But the bar owners failed to formally respond to either set of requests. (*Id.* at PageID.4102.) So the DDA moved to compel, and the Court held a hearing. (R. 61.)

On the day of the September 2017 hearing, the bar owners finally sent the DDA documents—12 in total. (R. 189, PageID.4099.) According to the DDA, the documents were mostly emails from the bar owners to DDA staff members, so they were already in the DDA's possession. (*Id.* at PageID.4099.) Paterson again acknowledged that he failed to follow Rule 34. (*Id.* at PageID.4102.) He also indicated that the 12 documents made up the entirety of the documentary record the bar owners had in their possession, custody, or control. (*Id.* at PageID.4103–4105.) But Paterson did say he was surprised to learn his clients kept so little in the way of business records and had so few documents to support a 10-count lawsuit alleging a conspiratorial plot to retaliate against the bar owners. (*Id.*) So the Court allowed Paterson seven additional days to consult with his clients and ensure that he had turned over all documents. (*Id.* at PageID.4105.)

At the hearing's conclusion, the Court issued several warnings to Plaintiffs. (R. 65.) First, the Court told Paterson that if Plaintiffs truly did not have any other documents responsive to the DDA's discovery requests, then they would be limited at summary judgment and trial to the 12 documents already produced, plus whatever the Defendants produced. (R. 189, PageID.4105; R. 65, PageID.1920–1921.) And the Court made plain:

> [I]f, during the course of this litigation, it is discovered or learned that you did have other documents within your possession, custody, and control that were not produced, I will consider sanctions -- I will impose monetary sanctions and I'll let the defendants brief the issue of why I shouldn't dismiss your case for a discovery sanction.
>
> So, I'm going to put you on notice that that is a likely and possible sanction. It's now been plenty of time. I've given you more than enough time to locate all of the documents they've asked for. And now you can tell your client you've got seven more days to make sure. And that's what you're limited to in this case. And if it turns out there are more, they're at risk that this case will be dismissed.

(R. 189, PageID.4105–4106.). In response, Paterson said "I accept that. And my client understands that." (R. 189, PageID.4106.)

Less than a month after entering the order regarding the second dispute, the first dispute resurfaced. This time, the DDA moved for entry of judgment against the bar owners because they failed to pay the attorney fee sanctions awarded to the DDA as a result of the first discovery dispute. (R. 70.) The Court granted the DDA's motion and entered the proposed judgment submitted by the DDA in the amount of $3,956.04 in favor of the DDA. (R. 78.) But the bar owners did not pay. So the DDA issued writs of garnishment to begin collecting. (R. 107, 108, 114, 115.) A few months later, pursuant to the parties' agreement and in lieu of the judgment, the Court entered an amended order giving the bar owners 30 days to pay the sanction. (R. 113, PageID.2255.) In other words, in March 2018, the Court gave the bar owners 30 more days to comply with a monetary sanction order issued nine months earlier. (*Id.*)

Plaintiffs did not comply. (R. 189, PageID.4076, 4291.) Indeed, they did not pay until June 22, 2018, well beyond the 30-day period—and one day after the DDA filed the present motion asking the Court to dismiss the case and to hold the bar owners in civil contempt due to their failure to pay. (*Compare* R. 189, PageID.4076, *with* R. 196, PageID.4426.)

Meanwhile, discovery progressed. And disputes continued to arise as the parties began deposing witnesses. As a result, the Court permitted limited extensions of the discovery deadline to ensure the parties completed discovery. (*See* R. 88, 113, 143.) The final deadline came and went in mid-June 2018. (R. 143, PageID.2651.)

But during the final depositions, the DDA learned about undisclosed documents in the bar owners' possession. In March 2018, the DDA deposed Plaintiff Christopher Williams, one of the owners. During the deposition, Williams said he had documents to support his retaliation allegations. (R. 189, PageID.4158.) But Williams did not have the documents with him and said Paterson never told him he should have brought them. (*Id.*) So the parties agreed to adjourn Williams' deposition until he produced the documents. (*Id.* at PageID.4159.) Eventually he did, sending additional documents to the DDA—19 in all. (R. 189-8.)

Then, at the continued deposition, Williams identified more discovery violations. For one, he spoke of additional unproduced documents pertaining to the operation of the bar. (R. 189, PageID.4270.) And he said he had unproduced records of Detroit Police citations issued to the bar. (*Id.* at PageID.4273.) And he said he never requested any records from the Michigan Liquor Control Commission (*id.* at PageID.4271–4272), despite the Court order directing the bar owners to do so by the end of June 2017 (R. 43, PageID.629).

Over a month later, the problems continued when Defendants deposed another Plaintiff, Kenneth Bridgewater. (R. 189-10.) For the first time, the DDA learned Bridgewater might have phone records documenting pre-bid conversations with Denis Archer, Jr. (R. 189, PageID.4276.) And Bridgewater arrived at the deposition with documents he refused to disclose to Defendants. (R. 189, PageID.4276, 4278.) Among the documents, Bridgewater said he had notes from meetings, all of which occurred prior to filing suit and all dealing with issues at the heart of this

case. (*Id.* at PageID.4277.) And Bridgewater said he had still more notes at home. (*Id.* at PageID.4278, 4279, 4281, 4286, 4287, 4288.) Bridgewater said the notes memorialized pre-bid meetings with redevelopment officials (*id.* at PageID.4277), settlement meetings with DDA officials (*id.* at PageID.4279), at least one conversation with the Mayor (*id.* at PageID.4280), multiple interactions with Detroit Police Officers (*id.* at PageID.4282–4283), a meeting where DDA officials allegedly told the bar owners the Mayor did not want "black clientele downtown" (*id.* at PageID.4285), and maybe records of fire code violations the bar received (*id.* at PageID.4288). Bridgewater never produced any of the documents. (R. 189, PageID.4075–4076.)

These depositions also revealed tax returns that had not been produced and which are relevant to the issue of damages. (R. 189, PageID.4079.) According to Plaintiffs, these returns were only recently filed and that is why they were not produced. (R. 196, PageID.4428.) But Plaintiffs do not reveal the filing date. (*Id.*)

Taken together, Williams and Bridgewater's revelation of documents previously undisclosed constitute a violation of the Court's September 2017 order and Federal Rules of Civil Procedure 34 and 37. (R. 65, PageID.1921.) And as that 2017 order put Paterson and the individual Plaintiffs on notice that disclosure of documents past late-September 2017 opened the door for the DDA to move to dismiss, the DDA so moved. (R. 189.)

Individual Plaintiffs oppose the motion through an untimely response. (R. 196.) (The corporate Plaintiff filed for Bankruptcy and is subject to an automatic stay.) The issues are familiar to the Court and so a hearing would not aid in the resolution of the motion. E.D. Mich. LR 7.1(f).

## II.

Where a plaintiff or plaintiff's counsel flouts the Federal Rules of Civil Procedure or court orders, the Rules contemplate dismissal of the action. *See* Fed. R. Civ. P. 41(b), 37(b) and (c). To

assess whether dismissal is warranted, the Court weighs four factors. *See Regional Refuse Systems, Inc. v. Inland Reclamation Co.*, 842 F.2d 150, 153–55 (6th Cir. 1988). The failures to comply must be "due to willfulness, bad faith, or fault"; the other side must show prejudice flowing from the conduct; the Court must have warned the noncompliant party that their conduct might bring about dismissal; and the Court must have at some point imposed or considered lesser sanctions. *Carpenter v. City of Flint*, 723 F.3d 700, 704 (6th Cir. 2013); *Harmon v. CSX Transp., Inc.*, 110 F.3d 364, 366–67 (6th Cir. 1997).

## III.

The DDA says all four factors point toward dismissal. (R. 189, PageID.4077.) Relevant to the first factor, Plaintiffs never "timely or voluntarily complied with any [written] discovery obligations." (*Id.*) Most telling, the DDA points to the paucity of documents initially produced and the much later revelation by Bridgewater and Williams that more documents have always existed. (*Id.* at PageID.4078–4079.) This noncompliance prejudiced the DDA to the tune of time and money spent on numerous conferences, motions, and hearings to obtain compliance with the Federal Rules of Civil Procedure. (*Id.* at PageID.4079–4080.) And Plaintiffs and their counsel had the benefit of both lesser sanctions and a warning to change their ways. (*Id.* at 4080–4081.)

Consistent with their discovery problems, Plaintiffs did not timely respond to the DDA's motion for the sanction of dismissal. *See* L.R. 7.1(e)(1)(B). When the bar owners finally did respond, they said they had complied with all the Court's discovery orders (R. 196, PageID.4428), and took issue with the DDA's attempt to hold them in civil contempt (*Id.* at PageID.4426). In particular, the bar owners said they had already paid the sanctions, so the DDA's assertions to the contrary were just "misleading and false arguments[.]" (R. 196, PageID.4426.) And the documents

9

the DDA says are missing are really just tax documents that the bar owners had not prepared or filed "until recently." (*Id.* at PageID.4428.)

The DDA replied. They attached a copy of two money orders from Paterson, payable to DDA. (R. 197, PageID.4440.) Each was dated June 22, 2018—one day *after* the DDA filed its motion to dismiss. (R. 189.)

The Court finds that the four-factor test supports dismissal as a discovery sanction.

## A.

The first factor "requires 'a clear record of delay or contumacious conduct.'" *Carpenter*, 723 F.3d at 704 (quoting *Freeland v. Amigo*, 103 F.3d 1271, 1277 (6th Cir. 1997)). Contumacious conduct can mean a few things. *Carpenter*, 723 F.3d at 704–05. One is behavior that is "'perverse in resisting authority' and 'stubbornly disobedient.'" *Schafer v. City of Defiance Police Dep't*, 529 F.3d 731, 737 (6th Cir. 2008) (quoting Webster's Third New International Dictionary 497 (1986)). Another is conduct displaying "either an intent to thwart judicial proceedings or a reckless disregard for the effect of [his] conduct on those proceedings." *Mulbah v. Detroit Bd. of Educ.*, 261 F.3d 586, 591 (6th Cir. 2001). And a third is conduct "stubbornly disobedient and willfully contemptuous." *Harmon*, 110 F.3d at 368.

Here, Plaintiffs and their counsel have violated multiple Court orders and failed to follow the Federal Rules on several occasions. (R. 189, PageID. 4102; R. 44, PageID. 642.) Recall that Plaintiffs provided dubious reasons for failing to turn over audit records that the Court ordered produced as part of the initial disclosures. And the audit records were again sought in a document request. So over a year ago, in June 2017, the Court directed Plaintiffs to request their own bar records from the Michigan Liquor Control Commission. That was never done—even prior to the lease issues being remanded to state court. (R. 189, PageID.4076; R. 189, PageID.4272.) Move on

to the September 2017 order. There, the Court ordered Paterson to consult with his clients over the next seven days to be certain that they had disclosed any and all responsive documents in their possession, custody, and control. And yet, months later, when the DDA deposed the individual Plaintiffs, they revealed undisclosed documents that are relevant and responsive. And presently, they continue to withhold them. Some records detail the business of running the bar, others detail actions taken against the bar by DPD officers, and still others memorialize meetings with DDA and City officials regarding the redevelopment plan. Just as clearly, Plaintiffs violated the Court's November 2017 and March 2018 orders directing them to pay certain of the DDA's costs and fees as a monetary sanction. After the bar owners did not pay under the November order, the March order issued, giving them until early April to pay. (R. 117, PageID. 4154.) They failed to do so. Plaintiffs did not pay the monetary sanction until June 22, 2018—the day after the DDA filed this motion to dismiss.

Unfortunately, neither the Plaintiffs nor Paterson have been forthright with the Court. Paterson offered shifting and unpersuasive explanations for his clients' failure to provide audit records. And in their (untimely) response to this motion, Plaintiffs claim that they have complied with all of the Court's discovery orders. But the record plainly belies that assertion. And, with the exception of the tax returns, Plaintiffs fail to even address, let alone explain, their failure to produce the other documents and records identified by the DDA. Worse still, the response states, "Contrary to the Defendant DDA's misleading and false arguments, individual Plaintiffs have paid the sanctions judgment entered by the Court in the amount of $3,957." (R. 196, PageID.4426.) But at the time the DDA filed the motion, June 21, 2018, Plaintiffs had not yet paid the sanctions. So the Plaintiffs are the ones making misleading and false statements.

11

All told, in two years, Plaintiffs and their counsel have violated three of the Court's discovery orders, ignored the Federal Rules of Civil Procedure, and have been less than honest in their representations to the Court. Their behavior goes beyond mere violation of the local rules or dilatory tactics. *See Carpenter*, 723 F.3d at 705 (declining to find contumacious the plaintiff's delayed filings and violations of the local rules); *Mulbah*, 261 F.3d at 592 (collecting cases to reason that mere "dilatory" conduct is not enough to show contumacious conduct). Added together, the conduct is contumacious. *See Harmon*, 110 F.3d at 368 (finding contumacious conduct where an attorney inadequately responded to court-ordered discovery requests, served nearly a year prior, and ignored the other party's requests for compliance); *see also Baron v. Univ. of Mich.*, 613 F. App'x 480, 484–85 (6th Cir. 2015) (finding contumacious conduct where plaintiff and her counsel provided incomplete discovery responses, never disclosed documents despite an order to compel, and never paid sanctions); *Smith v. Nationwide Mut. Fire Ins. Co.*, 410 F. App'x 891, 895–96 (6th Cir. 2010) (finding contumacious conduct where plaintiffs ignored discovery requests and refused to produce documents despite two court orders demanding they do so); *Fharmacy Records v. Nassar*, 248 F.R.D. 507, 530 (E.D. Mich. 2008) (finding contumacious conduct where, among other things, plaintiff and their attorney attempted to conceal evidence and lied to opposing counsel), *aff'd*, 379 F. App'x 522 (6th Cir. 2010). The first factor is satisfied.

## B.

As for the second factor, prejudice requires the DDA show they were "required to waste time, money, and effort in pursuit of cooperation which [the plaintiff] was legally obligated to provide." *Harmon*, 110 F.3d at 368.

The DDA says they have been "forced to file four motions directed at obtaining various discovery requests, attend multiple hearings on these motions, request and attend multiple 'meet

12

and confers,' and incur a substantial amount of otherwise unnecessary attorney's fees and costs."
(R. 189, PageID.4080.) And Williams' deposition had to be continued because he failed to provide
necessary documents. These added costs cause prejudice. *See Harmon*, 110 F.3d at 368. And the
record shows that, eventually, the DDA's lawyers will pass those added costs onto their clients.
(*See, e.g.*, R. 70-1.)

Moreover, the lengthy discovery period is technically over, so the DDA has expended more
than minimal efforts in this case. But there may be a need for some follow-up discovery.
Bridgewater was one of the last people deposed. He testified that he has proof of a conspiracy to
oust the Centre Bar from Harmonie Park. (R. 189-10.) But he also testified that he has not produced
all of his documentary proof. If he had disclosed the documents when the Court ordered him to do
so—nearly eight months prior to his deposition—then the DDA may have asked different
questions at Bridgewater's deposition, and at earlier ones. Re-deposing witnesses would only
increase the DDA's costs and prejudice.

The prejudice factor points to dismissal.

## C.

So, too, do the fair-warning and lesser-sanction factors. As for fair warning, back in
September 2017, the Court put Paterson "on notice" that dismissal was a "likely and possible
sanction" if Plaintiffs did not comply with the Court's discovery order. (R. 189, PageID.4105.)
Paterson said he understood, and he said his clients understood. So early on, Paterson "was warned
that failure to cooperate could lead to dismissal." *Mulbah*, 261 F.3d at 589. Second, at different
times, the Court imposed lesser sanctions in the form of a monetary fine and limits on the future
use of evidence if Paterson and his clients failed to produce everything they had (R. 43,
PageID.629–30; R. 65, PageID.1920). *See Carpenter*, 723 F.3d at 709–10. But, as detailed above,

13

the lesser sanctions did not result in compliance with the Court's orders or the Federal Rules of Civil Procedure. The September 2017 order provides an instructive example.

The final factors each point toward dismissal.

## D.

In the end, all four factors favor dismissal. Plaintiffs engaged in contumacious conduct and the DDA established prejudice as a result. The Court warned Plaintiffs that their continued disregard for the Court's orders and the Rules would make dismissal a likely sanction. And the Court tried lesser sanctions, but none worked.

Thus, the Court dismisses the individual Plaintiffs' claims against the DDA.

## IV.

The DDA also asks the Court to hold the bar owners in civil contempt for violating the Court's orders, especially the monetary-sanctions award. (R. 189, PageID.4082.) And the DDA wants the bar owners conditionally incarcerated until they pay. (*Id.* at PageID.4084.)

But contempt is a "serious" power to be used only as a "last resort." *Gascho v. Global Fitness Holdings, LLC*, 875 F.3d 795, 799 (6th Cir. 2017). And the DDA's motion has resulted in the payment of the monetary sanctions award. So the DDA's request to hold the Plaintiffs in contempt is denied.

## V.

In sum, the Court GRANTS in part and DENIES in part the DDA's motion to dismiss. (R. 189.) The Court dismisses the individual Plaintiffs' claims against the DDA but does not find them in civil contempt.

SO ORDERED.

s/Laurie J. Michelson
UNITED STATES DISTRICT JUDGE

14

Date:  October 9, 2018


      I hereby certify that a copy of the foregoing document was served upon counsel of record and/or pro se parties on this date, October 9, 2018, by electronic and/or ordinary mail.


                s/William Barkholz
                Case Manager

# EXHIBIT 8

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

GWENDOLYN WILLIAMS;
CHRISTOPHER WILLIAMS; AND
KENNETH SCOTT
BRIDGEWATER, *ET AL.*,

     Plaintiffs,

v.

DETROIT ECONOMIC
GROWTH CORPORATION; *ET AL.*,

     Defendants.

Case No. 16-cv-14112
Hon. Laurie J. Michelson
Mag. Judge Anthony P. Patti

---

**PATERSON LAW FIRM**
By: Andrew A. Paterson (P18690)
Counsel for Individual Plaintiffs
2893 East Eisenhower Parkway
Ann Arbor, Michigan 48108
(248) 568-9712
aap43@outlook.com

**KOTZ SANGSTER WYSOCKI P.C.**
By: Jeffrey M. Sangster (P30791)
    Anthony M. Sciara (P75778)
Counsel for DEGC
400 Renaissance Center
Suite 3400
Detroit, Michigan 48243
313-259-8300
jsangster@kotzsangster.com
asciara@kotzsangster.com

**CITY OF DETROIT LAW DEPARTMENT**
By: James D. Noseda (P52563)
Counsel for City of Detroit and
Individual Defendants
2 Woodward Avenue, 5th Floor
Detroit, Michigan 48226
(313) 224-4550
nosej@detroitmi.gov

---

### DETROIT ECONOMIC GROWTH CORPORATION'S COMBINED MOTION FOR SUMMARY JUDGMENT, OR DISMISSAL AS A SANCTION, OF INDIVIDUAL PLAINTIFFS' CLAIMS

Now comes Defendant Detroit Economic Growth Corporation, by its counsel, Kotz Sangster Wysocki P.C., in accordance with Federal Rules of Civil Procedure 56, 37, and 41, and for its Combined Motion for Summary Judgment, or Dismissal as a Sanction, of Individual Plaintiffs Gwendolyn Williams's, Christopher Williams's, and Kenneth Scott Bridgewater's claims in their Second Amended Complaint, states:

WHEREFORE, Defendant Detroit Economic Growth Corporation respectfully requests that, in accordance with Federal Rules of Civil Procedure 56, 37, and 41, and for the reasons stated in its brief in support of this combined motion and the exhibits appended thereto, this Court grant summary judgment on, or dismiss as a sanction, Plaintiffs Gwendolyn Williams's, Christopher Williams's, and Kenneth Scott Bridgewater's claims in their Second Amended Complaint.

Respectfully submitted,

**KOTZ SANGSTER WYSOCKI P.C.**

Dated: January 4, 2019     By:    /s/ Jeffrey M. Sangster

Jeffrey M. Sangster (P30791)
Anthony M. Sciara (P75778)
Counsel for DEGC

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

GWENDOLYN WILLIAMS;
CHRISTOPHER WILLIAMS; AND
KENNETH SCOTT
BRIDGEWATER, *ET AL*.,

     Plaintiffs,

v.

DETROIT ECONOMIC
GROWTH CORPORATION; *ET AL*.,

     Defendants.

Case No. 16-cv-14112
Hon. Laurie J. Michelson
Mag. Judge Anthony P. Patti

---

**PATERSON LAW FIRM**
By: Andrew A. Paterson (P18690)
Counsel for Individual Plaintiffs
2893 East Eisenhower Parkway
Ann Arbor, Michigan 48108
(248) 568-9712
aap43@outlook.com

**KOTZ SANGSTER WYSOCKI P.C.**
By: Jeffrey M. Sangster (P30791)
    Anthony M. Sciara (P75778)
Counsel for DEGC
400 Renaissance Center
Suite 3400
Detroit, Michigan 48243
313-259-8300
jsangster@kotzsangster.com
asciara@kotzsangster.com

**CITY OF DETROIT LAW DEPARTMENT**
By: James D. Noseda (P52563)
Counsel for City of Detroit and
Individual Defendants
2 Woodward Avenue, 5th Floor
Detroit, Michigan 48226
(313) 224-4550
nosej@detroitmi.gov

---

## DETROIT ECONOMIC GROWTH CORPORATION'S BRIEF IN SUPPORT OF ITS COMBINED MOTION FOR SUMMARY JUDGMENT, OR DISMISSAL AS A SANCTION, OF INDIVIDUAL PLAINTIFFS' CLAIMS

Now comes Defendant Detroit Economic Growth Corporation, by its counsel, Kotz Sangster Wysocki P.C., in accordance with Federal Rules of Civil Procedure 56, 37, and 41, and for its Brief in Support of Its Combined Motion for Summary Judgment, or Dismissal as a Sanction, of Individual Plaintiffs Gwendolyn Williams's, Christopher Williams's, and Kenneth Scott Bridgewater's claims in their Second Amended Complaint, states:

### QUESTIONS PRESENTED

A. Should this Court grant summary judgment on Counts I and II (first amendment retaliation) of the Complaint because Individual Plaintiffs cannot establish the necessary elements?

> DEGC: Yes.
> Individual Plaintiffs: No.

B. Should this Court grant summary judgment on Count III (equal protection) of the Complaint because Individual Plaintiffs cannot establish the necessary elements?

> DEGC: Yes.
> Individual Plaintiffs: No.

C. Should this Court, in any event, grant summary judgment on Counts I, II, and III (§ 1983 claims) of the Complaint because Individual Plaintiffs cannot establish a custom or policy of DEGC was a driving force behind the alleged deprivation of rights?

> DEGC: Yes.
> Individual Plaintiffs: No.

iv

D. Should this Court grant summary judgment on Count IV (promissory estoppel) of the Complaint because Individual Plaintiffs cannot establish the necessary elements?

        DEGC:                      Yes.
        Individual Plaintiffs:        No.

E. Should this Court grant summary judgment on Count V (tortious interference) of the Complaint because Individual Plaintiffs cannot establish the necessary elements?

        DEGC:                      Yes.
        Individual Plaintiffs:        No.

F. Should this Court grant summary judgment on Count VI (trespass) of the Complaint because Individual Plaintiffs cannot establish the necessary elements?

        DEGC:                      Yes.
        Individual Plaintiffs:        No.

G. Should this Court grant summary judgment on Counts VII and IX (claims for relief) of the Complaint because Individual Plaintiffs cannot establish the claims underlying them?

        DEGC:                      Yes.
        Individual Plaintiffs:        No.

H. In the event this Court grants summary judgment on Counts I, II, and III (federal claims) of Individual Plaintiffs' Complaint, should this Court retain jurisdiction over Counts IV, V, and VI (state law claims)?

        DEGC:                      Yes.
        Individual Plaintiffs:        No.

I. Should this Court dismiss all of Individual Plaintiffs' claims in the Complaint as a sanction because of Individual Plaintiffs contumacious disregard for this Court's orders?

        DEGC:                      Yes.
        Individual Plaintiffs:        No.

## Controlling or Most Appropriate Legal Authorities

A. Federal Rule of Civil Procedure 56

B. Federal Rule of Civil Procedure 37

C. Federal Rule of Civil Procedure 41

D. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986)

E. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50 (1986)

F. *Arnett v. Myers*, 281 F.3d 552, 560 (6th Cir. 2002)

G. *Bannum, Inc. v. City of Louisville*, 958 F.2d 1354, 1359-1360 (6th Cir. 1992)

H. *Street v. Correction Corporations of America*, 102 F.3d 810, 818 (6th Cir. 1996)

I. *Lakin v. Bloomin' Brands, Inc*, 2018 WL 488955, *2 (E.D. Mich., January 19, 2018)

J. *Health Call of Detroit v. Atrium Home & Health Care Services, Inc.*, 268 Mich. App. 83, 89, 706 N.W.2d 843 (2005)

K. *Adams v. Cleveland-Cliffs Iron Co.*, 237 Mich. App. 51, 67, 602 N.W.2d 215 (1999)

L. *Gamel v. City of Cincinnati*, 625 F.3d 949, 951 (6th Cir. 2010)

M. ECF Doc. No. 201

## Certification Under LR 7.1(A)

There was a conference between attorneys or unrepresented parties and other persons entitled to be heard on the motion in which the movant explained the nature of the motion or request and its legal basis and requested but did not obtain concurrence in the relief sought.

# TABLE OF CONTENTS

QUESTIONS PRESENTED ................................................................................................. iv

CONTROLLING OR MOST APPROPRIATE LEGAL AUTHORITIES ................................... vi

TABLE OF CONTENTS ................................................................................................. vii

INDEX OF AUTHORITIES .............................................................................................. vi

INDEX OF EXHIBITS ................................................................................................. viii

INTRODUCTION .......................................................................................................... 1

LEGAL STANDARD ...................................................................................................... 2

ARGUMENT ................................................................................................................ 4

   I.  **This Court Should Grant Summary Judgment On Counts I, II, III, IV, V, VI, VII, and IX Of The Complaint** ................................................................................... 4

     A.  **This Court Should Grant Summary Judgment On Counts I and II (First Amendment Retaliation) Of The Complaint Because Individual Plaintiffs Cannot Establish The Necessary Elements** .............................................................. 4

     B.  **This Court Should Grant Summary Judgment On Count III (Equal Protection) Of The Complaint Because Individual Plaintiffs Cannot Establish The Necessary Elements** ........................................................................................ 10

     C.  **This Court Should, In Any Event, Grant Summary Judgment On Counts I, II, and III (§ 1983 Claims) Of The Complaint Because Individual Plaintiffs Cannot Establish A Custom Or Policy Of DEGC Was The Driving Force Behind The Alleged Deprivations Of Rights** ............................................................ 12

     D.  **This Court Should Grant Summary Judgment On Count IV (Promissory Estoppel) Of The Complaint Because Individual Plaintiffs Cannot Establish The Necessary Elements** .................................................................................... 13

     E.  **This Court Should Grant Summary Judgment On Count V (Tortious Interference) Of The Complaint Because Individual Plaintiffs Cannot Establish The Necessary Elements** .................................................................................... 17

     F.  **This Court Should Grant Summary Judgment On Count VI (Trespass) Of The Complaint Because Individual Plaintiffs Cannot Establish The Necessary Elements** . 19

     G.  **This Court Should Grant Summary Judgment On Counts VII and IX (Claims For Relief) Of The Complaint Because Individual Plaintiffs Cannot Establish The Necessary Elements** ....................................................................... 20

   II.  **In The Event This Court Dismisses Counts I, II, And III (Federal Claims), This Court Should Nonetheless Retain Jurisdiction Over Counts IV, V, And VI (State Claims)** ............................................................................................ 21

   III.  **This Court Should Dismiss All Of Individual Plaintiffs' Claims Against DEGC Because Of Individual Plaintiffs' Contumacious Disregard For This Court's Orders** .... 24

## <u>Index of Authorities</u>

CASES                                                                                    PAGE(S)

*Adams v. Cleveland-Cliffs Iron Co.*,
  237 Mich. App. 51, 602 N.W.2d 215 (1999) .................................................. 6, 19

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)........................................................................ 6, 3, 20

*Ardt v. Titan Ins. Co.*,
  593 N.W.2d 215 (Mich. Ct. App. 1999)................................................... 14

*Arnett v. Myers*,
  281 F.3d 552 (6th Cir. 2002) ........................................................... 6, 4, 9

*Bannum, Inc. v. City of Louisville*,
  958 F.2d 1354 (6th Cir. 1992) ........................................................... 6, 11

*Carnegie–Mellon Univ. v. Cohill*,
  484 U.S. 343 (1988).......................................................................... 22

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)........................................................................ 6, 3, 20

*Douglas v. Co. of Jackson*,
  804 F. Supp. 944 (E.D. Mich. 1992) ..................................................... 3

*Douglas*,
  807 F. Supp. at 947-48......................................................................... 3

*First Sec. Sav. Bank v. Aitken*,
  573 N.W.2d 307 (Mich Ct. App. 1997)................................................... 15

*Gamel v. City of Cincinnati*,
  625 F.3d 949 (6th Cir. 2010) ........................................................... 6, 22

*Gutierrez v. Lynch*,
  826 F.2d 1534 (6th Cir. 1987) ............................................................... 5

*Hall v. Wooten*,
  506 F.2d 564 (6th Cir. 1974) .............................................................. 21

*Harper v. AutoAlliance Intern., Inc.*,
  392 F.3d 195 (6th Cir. 2004) .......................................................... 22, 23

*Health Call of Detroit v. Atrium Home & Health Care Services, Inc.*,
  268 Mich. App. 83, 706 N.W.2d 843 (2005) ...................................... 6, 17

*Lakin v. Bloomin' Brands, Inc*,
  2018 WL 488955 (E.D. Mich., January 19, 2018) .................................. 6, 14, 15

*Landefeld v. Marion Gen. Hosp., Inc*.,
  994 F.2d 1178 (6th Cir. 1993) ........................................................... 23

*Memphis, Tennessee Area Local, American Postal Workers Union, AFL–CIO v. City of Memphis*,
  361 F.3d 898 (6th Cir. 2004) ................................................................ 5
*Miller v. Sanilac Cnty.*,
  606 F.3d 240 (6th Cir.2010) ............................................................... 13
*Savoie v. Martin*,
  673 F.3d 488 (6th Cir. 2012) .............................................................. 13
*Scarbrough v. Morgan County Bd. of Educ.*,
  470 F.3d 250 (6th Cir. 2006) .............................................................. 11
*Sims-Eiland v Detroit Bd. of Ed.*,
  173 F. Supp. 2d 682 (E.D. Mich. 2001) ............................................ 7
*Street v. Correction Corporations of America*,
  102 F.3d 810 (6th Cir. 1996) ......................................................... 6, 12
*Warren v. City of Athens*,
  411 F.3d 697 (6th Cir. 2005) .............................................................. 12
*Young v BAC Home Loans Servicing, LP*,
  2012 WL 72299 (E.D. Mich. Jan. 10, 2012) .................................... 21

Statutes

42 U.S.C. § 1988 ..................................................................................... 21
MCL § 125.1651 ....................................................................................... 8

Rules

Federal Rule of Civil Procedure 37 ........................................................ 6
Federal Rule of Civil Procedure 41 ........................................................ 6
Federal Rules of Civil Procedure 56, 37, and 41 ........................... Passim

Other Authorities

<u>Certif</u> ...................................................................................................... 7
<u>LR 7</u> ........................................................................................................ 6

## INDEX OF EXHIBITS

**EXHIBIT 1**    **COMPLAINT**

**EXHIBIT 2**    **NUISANCE ABATEMENT ORDER**

**EXHIBIT 3**    **TRANSCRIPT HEARING**

**EXHIBIT 4**    **CHRISTOPHER WILLIAMS DEP TRANSCRIPT (3-14-18)**

**EXHIBIT 5**    **LEASE AGREEMENT**

**EXHIBIT 6**    **SAMPLE PLEADINGS**

**EXHIBIT 7**    **COMPLAINT AGAINST OTHER TENANTS**

**EXHIBIT 8**    **DEMANDS FOR POSSESSION**

**EXHIBIT 9**    **12/9/15 EMAIL**

**EXHIBIT 10**   **5/16/18 ORDER**

**EXHIBIT 11**   **RELATED HEARING TRANSCRIPT**

**EXHIBIT 12**   **10/24/18 ORDER**

**EXHIBIT 13**   **CHRISTOPHER WILLIAMS DEP TRANSCRIPT (4-2-18)**

**EXHIBIT 14**   **KENNETH SCOTT BRIDGEWATER DEP TRANSCRIPT**

**EXHIBIT 15**   **MODDIE TURAY DEP TRANSCRIPT**

**EXHIBIT 16**   **DISCOVERY REQUESTS**

**EXHIBIT 17**   **FINAL ORDER**

# INTRODUCTION

On September 29, 2017, Individual Plaintiffs and the entity they owned and controlled, Plaintiff Lotus Industries, LLC d/b/a Centre Park Bar ("Centre Park Bar") (collectively "Plaintiffs"), filed their Second Amended Verified Complaint for Declaratory Judgment and Injunctive Relief ("Complaint").[1] The Complaint primarily alleges a conspiracy by two entities and five individuals to retaliate against Plaintiffs for purportedly exercising their First Amendment rights. The Complaint contains nine counts against DEGC: (I-II) First Amendment Retaliation; (III) Equal Protection; (IV) Promissory Estoppel; (V) Tortious Interference; (VI) Trespassing; (VII) Injunctive Relief; and (IX) Attorney's Fees. The Court should grant summary judgment on, or dismiss as a sanction, all of them.

First, Individual Plaintiffs cannot establish DEGC retaliated against them for allegedly exercising their First Amendment rights because there is no evidence DEGC took any adverse action against them, no evidence DEGC conspired with anyone to take adverse action against them, and the eviction proceedings were necessary and justified. Second, Individual Plaintiffs cannot establish DEGC

---

[1] On March 22, 2018, the United States Bankruptcy Court for the Eastern District of Michigan found Centre Park Bar had filed a Chapter 11 proceeding in bad faith, converted the Chapter 11 proceeding to a Chapter 7 proceeding, and appointed a United States Trustee. See In re Lotus Industries, Case No. 18-40621, ECF Doc. No. 127. The proceeding was subsequently dismissed pursuant to settlement between the trustee and creditors.

denied them equal protection of the law because there is no evidence Centre Park Bar was treated differently than similarly situated businesses. Third, Individual Plaintiffs cannot, in any event, establish any of their § 1983 claims because there is no evidence a custom or policy of DEGC was the driving force behind the alleged deprivations of constitutional rights. Fourth, Individual Plaintiffs cannot establish their right to promissory estoppel because there is no evidence supporting any of the elements. Fifth, Individual Plaintiffs cannot establish tortious interference because there is no evidence supporting any of the elements. Sixth, Individual Plaintiffs cannot establish trespass because there is no evidence of any unauthorized intrusions by DEGC. Finally, in the event the Court does not grant summary judgment on the entire Complaint, the Court should nonetheless dismiss all remaining counts as a sanction for Individual Plaintiffs' contumacious disregard of the Court's orders. Accordingly, this Court should grant summary judgment on, or dismiss as a sanction, all counts of Individual Plaintiffs Complaint.[2]

## LEGAL STANDARD

Summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

---

[2] This motion does not request any relief against Centre Park Bar because, on November 9, 2018, this Court dismissed all claims made by Centre Park Bar in their entirety, with prejudice. See ECF Doc. No. 208.

show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. In considering a motion for summary judgment, the Court views all evidence in a light most favorable to the nonmovant and draws all reasonable inferences in favor of the nonmovant. *Douglas v. Co. of Jackson*, 804 F. Supp. 944, 947 (E.D. Mich. 1992).

The movant bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Douglas*, 807 F. Supp. at 947-48. The movant may discharge this burden by "'showing' – that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" *Id*. (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986)). Once the moving party does this, the burden shifts to the nonmoving party to set forth specific facts showing a genuine triable issue. *Id*. To show there exists a genuine issue of material fact, however, the nonmovant must do more than present some evidence on a disputed issue. *Id*. Rather, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the nonmovant's evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id*. (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50 (1986)).

3

## ARGUMENT

### I. This Court Should Grant Summary Judgment On Counts I, II, III, IV, V, VI, VII, and IX Of The Complaint

### A. This Court Should Grant Summary Judgment On Counts I and II (First Amendment Retaliation) Of The Complaint Because Individual Plaintiffs Cannot Establish The Necessary Elements

To establish a claim under section 1983 for First Amendment retaliation, a plaintiff must show: (1) that he or she engaged in protected conduct; (2) that an adverse action was taken against him or her that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) that there is a causal connection between elements one and two – i.e., a plaintiff must show that the adverse action was motivated, at least in part, by his or her protected conduct. *Arnett v. Myers*, 281 F.3d 552, 560 (6th Cir. 2002). Individual Plaintiffs claim DEGC took adverse action against them for publicly criticizing the RFP process by: (1) issuing noise citations to Centre Park Bar, (2) harassing Centre Park Bar, and (3) initiating eviction proceedings. (Complaint, p. 16-18, 19). There is no evidence to support these assertions.

First, DEGC did not issue noise citations to, or harass patrons at, Centre Park Bar. DEGC is not a policing authority. DEGC is a nonprofit corporation contracted to undertake certain activities on behalf of DDA. DEGC does not have legal authority to issue citations to anyone. Nor is there any evidence DEGC harassed anyone. In fact, Individual Plaintiffs' assert only that "the actions of

Detroit Police Officer[s], at the direction of Defendants Chief Craig and Duggan, taken against [Plaintiffs], were taken in retaliation against them," not that DEGC took any of these actions against them. (Complaint, p. 76) (See also Complaint, ¶¶ 69-75).

Second, DEGC did not conspire with anyone to issue noise citations to, or harass patrons at, Centre Park Bar. A civil conspiracy is an agreement between two or more persons to injure another by unlawful action. *Memphis, Tennessee Area Local, American Postal Workers Union, AFL–CIO v. City of Memphis,* 361 F.3d 898, 905 (6th Cir. 2004). Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy and each conspirator need not have known all of the details of the illegal plan or all of the participants involved. *Id*. But a plaintiff must show "[a] there was a single plan, [b] that the alleged coconspirator shared in the general conspiratorial objective, and [c] that an overt act was committed in furtherance of the conspiracy." *Id*. Significantly, conspiracy claims must be established with "some degree of specificity" and "vague and conclusory" assertions unsupported by material facts will not be sufficient to assert such a claim under § 1983. See *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987).

Here, while Individual Plaintiffs "believe" DEGC "conspired" with police officers and others to retaliate against them (Complaint, ¶¶ 81-82), aside from their

own convenient and speculative testimony, there has never been any evidence proffered supporting their allegation.  There is no evidence of a singular plan between DEGC and others to ticket and harass Individual Plaintiffs.  There is no evidence DEGC shared some broader conspiratorial objective to harass Individual Plaintiffs because of their alleged public criticisms of the RFP process.  And there is no evidence the noise violations Individual Plaintiffs received were merely pretextual acts in furtherance of some conspiracy.

In fact, on August 29, 2017, (then) Chief Judge of the Circuit Court of Wayne County, Robert J. Colombo, Jr., confirmed the legitimacy of the citations Centre Park Bar received by issuing an Order for Preliminary Injunction and Immediate Abatement of Nuisance ("Nuisance Abatement Order").  (See Nuisance Abatement Order, attached as Exhibit 2) (See also Transcript of Ruling, attached as Exhibit 3).  After a multi-day evidentiary hearing – including testimony from experts – Judge Colombo specifically ordered Plaintiffs to "immediately abate the nuisance and … enjoined [them] from any and all further violations of the Detroit noise ordinance…." (Id.).  In doing so, Judge Colombo found, among other things:

> "It's also very disturbing to me how little the Centre Park Bar cares about its neighbor at the Hilton Hotel and how little its [*sic*] done to try to address this issue.  It really reflects very poorly on the management team and ownership team at the Centre Park Bar, that they can't control the noise."

> "The police officers who have gone to the scene do that as a result of 911 calls. There has been a suggestion by Mr. Paterson that this is harassment. How is it harassment when citizens are calling the police department and complaining about the noise level at the Centre Park Bar and the Centre Park Bar refuses to address the issue?"

> "When the police officers come to the Centre Park Bar, they request the music to be turned down. Occasionally it happens. But they're required to come back later because the music has gone up to the elevation level that they were originally there for."

(Exhibit 3, p. 6-7) (emphasis added).

Significantly, Individual Plaintiffs are now collaterally estopped from claiming the noise violations issued by police officers were designed to harass them. Issue preclusion requires the court to consider four elements: 1) whether the issue decided in the prior adjudication was identical with the issue presented in the present action; 2) whether the prior adjudication resulted in a judgment on the merits; 3) whether the party against whom collateral estoppel is asserted was a party or in privity with a party to the prior adjudication; and, 4) whether the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue during the prior suit. *Sims-Eiland v Detroit Bd. of Ed.*, 173 F. Supp. 2d 682, 687 (E.D. Mich. 2001). All of these elements are satisfied here. Judge Colombo expressly found the noise violations were not intended to harass Individual Plaintiffs; Individual Plaintiffs were parties/privies to the other

7

proceeding; a final judgment has been entered in that case; and Individual Plaintiffs presented their arguments concerning the issue during a multi-day evidentiary hearing.  (See Exhibits 2 and 3) (See also Final Order, attached as Exhibit 17).

There are simply no pleadings, depositions, affidavits, answers to interrogatories, or admissions on file, which demonstrate – let alone with any specificity – DEGC participated in a conspiracy.  See Fed. R. Civ. P. 56.  Even Individual Plaintiffs know this: they have acknowledged they have nothing more than vague and conclusory assertions by admitting they have no documents "to support or prove" their claim "police officers" were "directed … to harass the plaintiffs."  (See Deposition of Christopher Williams, 3/14/18, p. 10, attached as Exhibit 4).

Third, while Individual Plaintiffs suggest the initiation of eviction proceedings was "adverse," DEGC did not initiate eviction proceedings against Individual Plaintiffs.  DEGC and DDA are not the same.  DDA is a Michigan public body corporate created by the Detroit City Council under statutory authority.  See MCL § 125.1651, *et seq*.  DEGC is a nonprofit corporation contracted to undertake certain activities on behalf of DDA.  DEGC does not own property.  DDA owns the property previously leased by Centre Park Bar.  DEGC was not Centre Park Bar's landlord.  DDA was Centre Park Bar's landlord.  (See

Lease, attached as Exhibit 5). DEGC was not a party in state court litigation with Centre Park Bar, Christopher Williams, and Gwendolyn Williams. DDA was the plaintiff in state court litigation with Centre Park Bar, Christopher Williams, and Gwendolyn Williams. (See Pleadings from State Court Proceedings, attached as Exhibit 6). In short, DEGC is nothing more than a nonprofit corporation contracted to undertake certain activities on behalf of DDA. DEGC had nothing to do with the eviction proceedings.

Moreover, there is no evidence the eviction proceedings were motivated by Plaintiffs' criticism of the RFP process. See *Arnett*, 281 F.3d at 560 ("adverse action" must be "motivated … by … protected conduct.") (See also Complaints Against Other Delinquent Tenants, attached as Exhibit 7). Indeed, *ten* demands for possession had been issued by DDA to Centre Park Bar for nonpayment of rent *before* its submission to the RFP process was rejected. (See Demands for Possession and 12/9/15 Email, attached as Exhibits 8 and 9). The legitimacy of these demands, and the importance of the proceedings that followed, were only further confirmed during the nuisance abatement hearing and the two state court judgments awarding DDA collectively $174,854.76 in unpaid rent. (See 5/16/18 Order, Related Hearing Transcript, and 10/24/18 Order, attached as Exhibits 10, 11, and 12). The proceedings were obviously justified. Accordingly, this Court should grant summary judgment on Counts I and II of the Complaint because

9

Individual Plaintiffs cannot establish the necessary elements of their First Amendment retaliation claims.

## B. This Court Should Grant Summary Judgment On Count III (Equal Protection) Of The Complaint Because Individual Plaintiffs Cannot Establish The Necessary Elements[3]

Individual Plaintiffs *allege* Centre Park Bar was "unfairly and unlawfully targeted for harassment by Defendants Duggan and Chief Craig because it is an African-American black owned business and the majority owner … is an African-American woman and because a majority of its patrons are African-American." (Complaint, ¶ 96). Individual Plaintiffs further *allege* "[n]o other bar or restaurant establishment in the Harmonie Park or Paradise Valley area have been subjected to the similar police harassment for purported noise complaints or for claimed 'over capacity' violations of the City's Fire Code." (Id. at ¶ 97). But Individual Plaintiffs have failed to produce any *evidence* supporting these conclusory allegations.

For example, Individual Plaintiffs have failed to produce any evidence establishing they were treated differently than businesses similarly situated to Centre Park Bar. The basis of an equal protection claim is disparate treatment by

---

[3] It is not clear whether Count III is even pled against DEGC. In paragraph 96 of the Complaint, Individual Plaintiffs complain of only "Defendants Duggan and Chief Craig." Yet, in the remainder of Count III, Individual Plaintiffs often reference "Defendants" plural. Consequently, out of caution, and to the extent this Court construes Count III as alleged against DEGC as well, DEGC has addressed Count III.

the government of those who are similarly situated. See *Bannum, Inc. v. City of Louisville*, 958 F.2d 1354, 1359-1360 (6th Cir. 1992); see also *Scarbrough v. Morgan County Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006) ("The threshold element of an equal protection claim is disparate treatment."). Here, while Individual Plaintiffs have vaguely suggested "Old Shillelagh's" and other unidentified, so-called "white bars" were not issued citations for supposedly similar conduct, aside from Individual Plaintiffs own nonspecific speculation, there is no evidence supporting their claim. To wit:

> Q:   And do you know if complaints were made and no response was – that the police did not respond to noise complaints about any other businesses?
>
> A:   No, they haven't.
>
> Q:   Do you know that?
>
> A:   Yes, I know that.
>
> Q:   Do you know that complaints were made?
>
> A:   I know complaints were made about me –
>
> Q:   No, no.
>
> A:   -- I know that complaints were not made about them.
>
> Q:   Okay.
>
> A:   Because if complaints were made about them, they will be shut down like I was.

(See Deposition Transcript of Christopher Williams (4/2/18), p. 272, attached as Exhibit 13).

Moreover, even if these conclusory assertions were somehow sufficient (they are not), there remains a complete absence of evidence the citations issued to Centre Park Bar were "so unrelated to the achievement of any combination of legitimate purposes that the court can only conclude that the government's actions were irrational." *Warren v. City of Athens*, 411 F.3d 697, 710-11 (6th Cir. 2005). In fact, the actual evidence establishes the opposite conclusion. (See § I. A. above). Accordingly, this Court should grant summary judgment on Count III of the Complaint because Individual Plaintiffs cannot establish the necessary elements of their Equal Protection claim.

## C. This Court Should, In Any Event, Grant Summary Judgment On Counts I, II, and III (§ 1983 Claims) Of The Complaint Because Individual Plaintiffs Cannot Establish A Custom Or Policy Of DEGC Was The Driving Force Behind The Alleged Deprivations Of Rights

As discussed above, Individual Plaintiffs assert Section 1983 actions claiming DEGC violated their constitutional rights. (Complaint, p. 13-22). But DEGC is not an individual. DEGC is a nonprofit corporation contracted to undertake certain activities on behalf of DDA. And such a defendant "cannot be held liable under section 1983 on a respondeat superior or vicarious liability basis." *Street v. Correction Corporations of America*, 102 F.3d 810, 818 (6th Cir. 1996) (applying rule to municipal and private corporations). Rather, "under

Section 1983," DEGC's liability "depends upon a demonstration that [Individual Plaintiffs'] 'constitutional rights were violated and that a policy or custom' of [DEGC 'was the moving force behind the deprivation of [Plaintiffs'] rights.'" *Savoie v. Martin*, 673 F.3d 488, 494 (6th Cir. 2012) (quoting *Miller v. Sanilac Cnty.,* 606 F.3d 240, 255 (6th Cir.2010)). Yet Individual Plaintiffs have never even *pled* a policy or custom of DEGC was the moving force behind their alleged deprivation of rights, let alone produced any *evidence* to support this necessary element of their § 1983 claims. Accordingly, even if Individual Plaintiffs could establish the underlying elements of their constitutional claims (they cannot), this Court should nonetheless grant summary judgment on Counts I, II, and III because Individual Plaintiffs cannot establish a policy or custom of DEGC was the moving force behind their alleged deprivation of rights.[4]

### D. This Court Should Grant Summary Judgment On Count IV (Promissory Estoppel) Of The Complaint Because Individual Plaintiffs Cannot Establish The Necessary Elements

Individual Plaintiffs admit the RFP required all proposals to be submitted "no later than 3:00 p.m. November 11, 2015." (See Exhibit 4, p. 27) (See also Deposition of Kenneth Scott Bridgewater, p. 24-27, attached as Exhibit 14)

---

[4] In the event this Court grants summary judgment on Counts I, II, and III (federal claims), and for the reasons discussed in Section II. below, this Court should nonetheless exercise its discretion to retain jurisdiction over Counts IV, V, and VI (state claims) and grant summary judgment on them for the reasons stated in this motion.

(aware of deadline and consequences of noncompliance). Individual Plaintiffs also admit their proposal was submitted after the deadline. (See Complaint, ¶ 34) ("Shortly after 3:00 p.m. on November 11, 2015…"); (See also Exhibit 4, p. 27-29); (proposal stamped at 3:19 p.m.); (See also Exhibit 14, p. 24-27 (submitted proposal "late" and "after the deadline").

Yet Individual Plaintiffs nonetheless ask this Court to force DEGC – via promissory estoppel – to consider their proposal and/or award damages against DEGC for not doing so. To succeed on a claim of promissory estoppel, Individual Plaintiffs must establish (1) a promise, (2) the promisor should reasonably have expected to induce action of a definite and substantial character on the part of the promisee, (3) which in fact produced reliance or forbearance and (4) must be enforced to avoid injustice. *Lakin v. Bloomin' Brands, Inc*, 2018 WL 488955, *2 (E.D. Mich., January 19, 2018) (citing *Ardt v. Titan Ins. Co.*, 593 N.W.2d 215, 219 (Mich. Ct. App. 1999). There is no evidence to support any of these elements.

First, Individual Plaintiffs cannot establish a promise sufficient to invoke promissory estoppel. According to Individual Plaintiffs, upon Kenneth Scott Bridgewater's arrival to submit their proposal, he realized the proposal was left in his vehicle, which had parked by a valet service. (Exhibit 14, p. 24-27). After retrieving the proposal from his vehicle, and submitting the proposal to the

front desk subsequent to the deadline, Mr. Bridgewater alleges a receptionist "promised" DEGC would nonetheless consider the late proposal by stating: "I know you were here, so I'll let them know that was it." (Exhibit 14, p. 26). Even assuming Mr. Bridgewater's testimony is accurate, such a vague statement from a receptionist is hardly sufficient to invoke promissory estoppel. Indeed, a "promise under promissory estoppel is 'a manifestation of intention to act ... in a specified way, so made as to justify a promisee in understanding that a commitment has been made.'" *Lakin*, 2018 WL 488955 at 2 (quoting *First Sec. Sav. Bank v. Aitken*, 573 N.W.2d 307, 317 (Mich Ct. App. 1997).

Second, even assuming the above statement was a "promise," there is no evidence DEGC should reasonably have expected such a "promise" to induce action of a definite and substantial character on the part of Individual Plaintiffs. This is because, aside from waiting to learn whether the proposal had been chosen, there was nothing further for Individual Plaintiffs to do. Any work performed in connection with the proposal was necessarily completed *prior* to submitting the proposal. There was simply no "action of a definite and substantial character" DEGC should have reasonably expected Individual Plaintiffs would undertake after making the alleged "promise."

15

Third, there is no evidence the alleged "promise" produced any reliance or forbearance by Individual Plaintiffs.  In fact, Individual Plaintiffs have admitted precisely the opposite:

> Q:    Mr. Williams what did Centre Park do to rely?
>
> A:    We assumed it would be evaluated with the rest of the proposals.
>
> Q:    Okay.  But what did you do based on your assumption it would be evaluated.
>
> A:    I didn't know that – I didn't know reliance required an activity.
>
> Q:    I'm just asking you what you did.  You say you relied.  Did you go out and buy a million dollars of instruction [*sic*] materials?
>
> A:    No.
>
> Q:    Did you spend any money based on that reliance?
>
> A:    No.  We didn't spend, any money.
>
> Q:    Okay.  Did you take any other action based on that reliance?
>
> A:    Other than assuming it would be evaluated, I don't think so.
>
> Q:    Other than what?
>
> A:    Other than assuming it would be evaluated in the course of business as promised, I don't think – that's it.

(Exhibit 4, p. 67-68).

16

Finally, even if Individual Plaintiffs could establish the other elements of promissory estoppel (they cannot), there is no evidence to support the necessity of invoking the Court's equitable powers and enforcing the "promise" to avoid an injustice.  In short, Individual Plaintiffs admit they submitted their proposal late, they understood the potential consequences of submitting their proposal late, and there is no evidence the proposal was rejected for any reason other than its tardiness.  (Exhibit 9) ("Your proposal was not selected from the following reason … Proposal … was submitted after the due date and/or time as mentioned in the RFP on page 3.").  In fact, two other submissions were tardy and neither of those were considered either.  (See Deposition of Moddie Turay, p. 135-140, attached as Exhibit 15).  All tardy proposals were treated identically.  (Id.).  Accordingly, this Court should grant summary judgment on Count IV of the Complaint because Individual Plaintiffs cannot establish the elements of promissory estoppel.

### E. This Court Should Grant Summary Judgment On Count V (Tortious Interference) Of The Complaint Because Individual Plaintiffs Cannot Establish The Necessary Elements

Individual Plaintiffs claim DEGC tortiously interfered with their contracts and/or business relationships.  (Complaint, p. 23-26).  Tortious interference with a contract or contractual relations is a cause of action distinct from tortious interference with a business relationship or expectancy.  *Health Call of Detroit*

17

*v. Atrium Home & Health Care Services, Inc.*, 268 Mich. App. 83, 89, 706 N.W.2d 843 (2005).  The elements of tortious interference with a contract are: (1) the existence of a contract, (2) a breach of the contract, (3) an unjustified instigation of the breach by the defendant, and (4) damages as a result of defendant's conduct.  *Id*. at 89-90; see also M Civ. JI 125.01 and 126.01 (adding damages element).   The elements of tortious interference with a business relationship or expectancy are: (1) the existence of a valid business relationship or expectancy that is not necessarily predicated on an enforceable contract, (2) knowledge of the relationship or expectancy on the part of the defendant interferer, (3) an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and (4) resulting damage to the party whose relationship or expectancy was disrupted.

Individual Plaintiffs cannot establish any of these elements here.  First, aside from a vague reference to "customers, event planners, etcetera that would typically use … Centre Park as a venue for … various engagements," Individual Plaintiffs have never identified a specific contract or relationship they allege DEGC interfered with.  (Exhibit 13, p. 187-193).  Second, Individual Plaintiffs have never provided evidence DEGC had any knowledge of such a specific contract or relationship.  (Id.).  Third, Individual Plaintiffs have never provided evidence DEGC interfered with such a specific contract or relationship.  (Id.).

Fourth, Individual Plaintiffs have never provided evidence such a specific contract or relationship was actually terminated.  (Id.).  Finally, even assuming Individual Plaintiffs could establish all of the other elements, they have never provided any evidence of damages arising from the termination of such a specific contract or relationship.  (Id.).  Accordingly, this Court should grant summary judgment on Count V of the Complaint because Individual Plaintiffs cannot establish the elements of tortious interference.

## F. This Court Should Grant Summary Judgment On Count VI (Trespass) Of The Complaint Because Individual Plaintiffs Cannot Establish The Necessary Elements

Recovery for trespass to land in Michigan is available only upon proof of (1) an unauthorized (2) direct or immediate intrusion (3) of a physical, tangible object (4) onto land over which the plaintiff has a right of exclusive possession. *Adams v. Cleveland-Cliffs Iron Co.*, 237 Mich. App. 51, 67, 602 N.W.2d 215 (1999).  Individual Plaintiffs, however, have not provided sufficient evidence to establish any *unauthorized* intrusions by DEGC at Centre Park Bar.  First, it should again be noted DDA owns and leased the subject property to Centre Park Bar, not DEGC.  DEGC was nothing more than a nonprofit corporation contracted to undertake certain activities on behalf of DDA.  Second, in any event, Individual Plaintiffs vaguely claim DDA's property manager (Scott Harrison) accessed Centre Park Bar "countless" times for the purpose of

19

allowing appraisers to view the property, another tenant to access the basement, and contractors to work on the premises. (Exhibit 14, p. 93-96). But even assuming Individual Plaintiffs' testimony is true, the Lease expressly allowed access for these purposes (among others):

> [Centre Park Bar] shall permit [DDA], and [DDA], its representatives, agents, contractors and subcontractors [i.e., DEGC and Scott Harrison] shall have the right, to enter the Premises at all reasonable times for the purposes of (a) inspecting the Premises or the Building, (b) maintaining the Premises or the Building, (c) making repairs, alterations or additions to the Premises or the Building and improvements on the Land, or (d) performing any obligations of [DDA] under this Lease. [DDA] may show the Premises to prospective purchasers, mortgagees and (during the final six (6) months of the term) tenants and may display about the Premises signs advertising the availability of the Premises.

(Exhibit 5, § 15.1). Given the above, Individual Plaintiffs have simply not provided "'sufficient evidence favoring [them] for [the Court] to return a verdict for [them].'" *Celotex Corp.*, 477 U.S. at 325 (quoting *Anderson,* 477 U.S. at 249-50 (1986). Accordingly, this Court should grant summary judgment on Count VI of the Complaint because Individual Plaintiffs cannot establish the elements of a trespass.

**G. This Court Should Grant Summary Judgment On Counts VII and IX (Claims For Relief) Of The Complaint Because Individual Plaintiffs Cannot Establish The Necessary Elements**

Counts VII and IX of the Complaint each purport to state claims for relief, rather than causes of action. (Complaint, p. 22-26). Count VII purports to state a claim for injunctive relief. (Id. at p. 22-23). Count IX purports to state a claim for entitlement to attorney's fees under 42 U.S.C. § 1988. (Id. at p. 30). These "claims" are actually requests for remedies and not affirmative causes of action. See *Hall v. Wooten*, 506 F.2d 564, 568 (6th Cir. 1974) ("We have held that section 1988 does not create federal causes of action for violation of civil rights.") and *Young v BAC Home Loans Servicing, LP*, 2012 WL 72299, *4 (E.D. Mich. Jan. 10, 2012) ("Injunctive relief is not a separate cause of action, but rather a type of relief the court may grant."). They instead depend upon the success of the underlying federal and state claims. See *Young*, *supra* ("It is not the remedy that supports the cause of action, but rather the cause of action that supports the remedy.") (internal quotations and citations omitted). For the reasons discussed above, however, those underlying claims all fail, and so must the related claims for relief. Accordingly, this Court should also dismiss Individual Plaintiffs' claims in Counts VII and IX of the Complaint because Individual Plaintiffs cannot establish the claims underlying them.

## II. In The Event This Court Dismisses Counts I, II, And III (Federal Claims), This Court Should Nonetheless Retain Jurisdiction Over Counts IV, V, And VI (State Claims)

In the event this Court dismisses Counts I, II, and III (federal claims), this Court should nonetheless retain jurisdiction over Counts IV, V, and VI (state claims). A district court has broad discretion to retain jurisdiction over supplemental claims. *Gamel v. City of Cincinnati*, 625 F.3d 949, 951 (6th Cir. 2010). In determining whether to retain jurisdiction over such claims, a district court should consider and weigh several factors, including the values of judicial economy, convenience, fairness, and comity. *Id*. (citing *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350 (1988) (quotations omitted)). While the balance of factors often points to dismissing state claims when federal claims have been dismissed before trial, "[t]here are … circumstances where a district court should retain supplemental jurisdiction even if all of the underlying federal claims have been dismissed." *Id*. at 952.

For example, the Sixth Circuit has "found that the following factors weighed in favor of retaining supplemental jurisdiction over the remaining state-law claims: (1) the plaintiff had engaged in forum manipulation by deciding to dismiss his federal-law claims only after the case had been on the district court's docket for 11 months, (2) the parties had completed discovery, and (3) the defendants' summary-judgment motions were ripe for decision." *Gamel*, 625 F.3d at 952 (citing *Harper v. AutoAlliance Intern., Inc.*, 392 F.3d 195 (6th Cir. 2004)). The Sixth Circuit also noted the importance of a district court being

22

"'familiar with the facts of the case'" after having "'invested significant time in the litigation'" and "'avoiding a multiplicity of litigation.'" *Id.* (quoting *Harper*, *supra* and *Landefeld v. Marion Gen. Hosp., Inc*., 994 F.2d 1178, 1182 (6th Cir. 1993)).

These factors counsel in favor of retaining jurisdiction here. First, the parties' completed nineteen months of discovery more than six months ago. This case was filed by Plaintiffs on November 19, 2016. See ECF Doc. No. 1. The parties were allowed to conduct fact discovery until April 30, 2018, and expert discovery until June 29, 2018. See ECF Doc. No. 113 and 143. Individual Plaintiffs should not be rewarded with the opportunity to conduct additional discovery through new litigation in another forum because *they* failed to meet *their* burden of establishing their federal claims. Indeed, the prejudice to DEGC from such a result is obvious given Individual Plaintiffs' extensively documented failures to participate in, and comply with, discovery in this case. See e.g., ECF Doc. No. 201.

Second, dispositive motions challenging Individual Plaintiffs' state claims are ripe for decision. Meritorious arguments attacking Individual Plaintiffs' state claims have been advanced in this motion and a separately filed motion for dismissal. Third, this Court is extremely familiar with the facts in this case and has invested significant time in the litigation. This case began more than two

years ago.  See ECF Doc. No. 1.  There have been more than two hundred documents filed.  This Court has resolved a litany of discovery disputes, a factually intensive dispositive motion for dismissal as a sanction, and conducted numerous conferences with the parties.  Fourth, retaining jurisdiction over the state law claims will avoid a multiplicity of litigation.  There has already been extensive litigation arising from these underlying facts involving Plaintiffs, DEGC, and DDA in this Court, United States Bankruptcy Court, and the Circuit Court of Wayne County.  If the Court now declines to retain jurisdiction over Individual Plaintiffs' state law claims, they will certainly file them in Wayne county, which will begin this frivolous and costly litigation again.  Principles of judicial economy, fairness, and convenience all strongly counsel against allowing this to occur.  Accordingly, in the event this Court dismisses Counts I, II, and III (federal claims) of the Complaint, it should nonetheless retain jurisdiction over Counts IV, V, and VI (state claims).

### III. This Court Should Dismiss All Of Individual Plaintiffs' Claims Against DEGC Because Of Individual Plaintiffs' Contumacious Disregard For This Court's Orders

In the event this Court does not grant summary judgment on all of Individual Plaintiffs' claims, this Court should nonetheless dismiss any remaining claims as a sanction for Individual Plaintiffs' contumacious disregard of this Court's orders.  A substantial factor underlying this Court's reason for

24

dismissing Individual Plaintiffs' claims as a sanction against DDA was Individual Plaintiffs' failure to respond to discovery requests – despite false representations by Individual Plaintiffs' counsel, orders from the Court, and even specific admonishment warning of dismissal. See ECF Doc. No. 201, p. 5-6, 10-11. Those discovery requests were *jointly* served by DDA and DEGC. (See Discovery Requests, attached as Exhibit 16). In other words, DEGC suffered the same prejudice arising from Individual Plaintiffs' failure to respond to those requests, including all the related conferences, motions, and hearings. This prejudice also created a "'substantial amount of otherwise unnecessary attorney's fees and costs'" for DEGC as well. See ECF Doc. No. 201, p. 13. Accordingly, for the same reasons it dismissed all claims against DDA, this Court should dismiss any remaining claims as a sanction for Individual Plaintiffs' contumacious disregard of this Court's orders.

WHEREFORE, Defendant Detroit Economic Growth Corporation respectfully requests that, in accordance with Federal Rules of Civil Procedure 56, 37, and 41, this Court grant summary judgment on, or dismiss as a sanction, Plaintiffs Gwendolyn Williams's, Christopher Williams's, and Kenneth Scott Bridgewater's claims in their Second Amended Complaint.

Respectfully submitted,
**KOTZ SANGSTER WYSOCKI P.C.**

Dated: January 4, 2019          By:    /s/ Jeffrey M. Sangster

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

GWENDOLYN WILLIAMS;
CHRISTOPHER WILLIAMS; AND
KENNETH SCOTT
BRIDGEWATER, *ET AL.*,

    Plaintiffs,

v.

DETROIT ECONOMIC
GROWTH CORPORATION; *ET AL.*,

    Defendants.

Case No. 16-cv-14112
Hon. Laurie J. Michelson
Mag. Judge Anthony P. Patti

---

**PATERSON LAW FIRM**
By: Andrew A. Paterson (P18690)
Counsel for Individual Plaintiffs
2893 East Eisenhower Parkway
Ann Arbor, Michigan 48108
(248) 568-9712
aap43@outlook.com

**KOTZ SANGSTER WYSOCKI P.C.**
By: Jeffrey M. Sangster (P30791)
    Anthony M. Sciara (P75778)
Counsel for DEGC
400 Renaissance Center
Suite 3400
Detroit, Michigan 48243
313-259-8300
jsangster@kotzsangster.com
asciara@kotzsangster.com

**CITY OF DETROIT LAW DEPARTMENT**
By: James D. Noseda (P52563)
Counsel for City of Detroit and
Individual Defendants
2 Woodward Avenue, 5th Floor
Detroit, Michigan 48226
(313) 224-4550
nosej@detroitmi.gov

---

1

## CERTIFICATE OF SERVICE

I hereby certify that, to the best of my information, knowledge, and belief, and on the 4th day of January, 2019, I electronically filed the foregoing pleadings with the Clerk of the Court using the ECF system, which will send notification of, and serve, such filing to all counsel of record.


/s/ Lindsey Pfund

# EXHIBIT 9

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**Lotus Industries, LLC** d/b/a Centre Park
Bar, **Gwendolyn Williams, Christopher**
**Williams,** and **Kenneth Scott Bridgewater,**

      Plaintiffs,                                 Case No. 16-14112

-vs-                                      Judge Laurie J. Michelson

**Michael Duggan,** in his official capacity
as Mayor of the City of Detroit, **Detroit**
**Economic Growth Corporation, City of Detroit**
**Downtown Development Authority, Marshall**
**Bullock,** in his official capacity as an appointee
of Mayor Mike Duggan, **Police Chief James Craig,**
in his official capacity as Chief of Police for the City
of Detroit, **Officer R. Harris,** in his official capacity
as Detroit Police Officer, and **Cpt. Kevin Harris,** in his
official capacity as a Captain of the Detroit Fire Department,

      Defendants.

---

| | |
|---|---|
| Andrew Paterson (P18690) | James D. Noseda (P52563) |
| *Attorney for plaintiffs* | City of Detroit Law Department |
| 46350 Grand River, Suite C | *Attorney for defendants City of Detroit,* |
| Novi, MI 48374 | *Mayor Duggan, Chief Craig, Marshall* |
| Phone: (248) 568-9712 | *Bullock, R. Harris and K. Harris (sued* |
| Email: aap43@outlok.com | *in their official capacity)* |
| | Coleman A. Young Municipal Center 2 |
| | Woodward Avenue, Suite 500 Detroit, |
| | MI 48226 |
| | Phone: (313) 237-3057 |
| | Email: nosej@detroitmi.gov |

Jeffrey M. Sangster (P30791)
Christopher A. Ferlito (P80574)
Kotz Sangster Wysocki, P.C.
*Attorney for defendants City of Detroit
Downtown Development Authority,
Detroit Economic Growth Corporation*
400 Renaissance Ctr, Suite 3400
Phone: (313) 259-8300
Detroit, MI 48243
email: jsangster@kotzsangster.com
email: cferlito@kotzsangster.com

Reginald M. Turner, Jr. (P40543)
Christopher M. Trebilcock (P62101)
CLARK HILL PLC
*Attorneys for defendants City of Detroit,
Mayor Duggan, Chief Craig, Marshall
Bullock, R. Harris and K. Harris (sued
in their official capacity)*
500 Woodward Avenue, Suite 3500
Detroit, MI 48226
Phone: (313) 965-8300
rturner@clarkhill.com
ctrebilcock@clarkhill.com

---

## **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Detroit Mayor Michael Duggan, Detroit Police Department Chief James Craig, Marshall Bullock, Detroit Police Department Officer R. Harris and Detroit Fire Department Captain K. Harris (sued in their official capacities), as well as the City of Detroit (collectively referred to as the "Defendant"), by and through its undersigned attorneys, move pursuant to Federal Rules of Civil Procedure 56, for summary judgment of the above-captioned litigation on Counts I, III, VIII & IX of the Plaintiffs' Gwendolyn Williams, Christopher Williams, and Kenneth Scott Bridgewater's Second Amended Complaint, for the reasons set forth in the following brief in support.

Respectfully submitted,

CLARK HILL PLC

By: /s/Reginald M. Turner, Jr.
Reginald M. Turner, Jr. (P40543)
Christopher M. Trebilcock (P62101)
CLARK HILL PLC
*Attorneys for defendants City of Detroit,*
*Mayor Duggan, Chief Craig, Marshall*
*Bullock, R. Harris and K. Harris (sued*
*in their official capacity)*
500 Woodward Avenue, Suite 3500
Detroit, MI 48226
(313) 965-8300
rturner@clarkhill.com
ctrebilcock@clarkhill.com

Date: January 4, 2019

3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**Lotus Industries, LLC** d/b/a Centre Park
Bar, **Gwendolyn Williams, Christopher
Williams,** and **Kenneth Scott Bridgewater,**

Plaintiffs,                                             Case No. 16-14112

-vs-                                                   Judge Laurie J. Michelson

**Michael Duggan,** in his official capacity
as Mayor of the City of Detroit, **Detroit
Economic Growth Corporation, City of Detroit
Downtown Development Authority, Marshall
Bullock,** in his official capacity as an appointee
of Mayor Mike Duggan **Police Chief James Craig,**
in his official capacity as Chief of Police for the City
of Detroit, **Officer R. Harris,** in his official capacity
as Detroit Police Officer, and **Cpt. Kevin Harris,** in his
official capacity as a Captain of the Detroit Fire Department,

Defendants.

---

Andrew Paterson (P18690)
*Attorney for plaintiffs*
46350 Grand River, Suite C
Novi, MI 48374
Phone: (248) 568-9712
Email: aap43@outlok.com

James D. Noseda (P52563)
City of Detroit Law Department
*Attorney for defendants City of Detroit,
Mayor Duggan, Chief Craig, Marshall
Bullock, R. Harris and K. Harris (sued
in their official capacity)*
Coleman A. Young Municipal Center 2
Woodward Avenue, Suite 500 Detroit,
MI 48226
Phone: (313) 237-3057
Email: nosej@detroitmi.gov

Jeffrey M. Sangster (P30791)
Christopher A. Ferlito (P80574)
Kotz Sangster Wysocki, P.C.
*Attorney for defendants City of Detroit*
*Downtown Development Authority,*
*Detroit Economic Growth Corporation*
400 Renaissance Ctr, Suite 3400
Phone: (313) 259-8300
Detroit, MI 48243
email: jsangster@kotzsangster.com
email: cferlito@kotzsangster.com

Reginald M. Turner, Jr. (P40543)
Christopher M. Trebilcock (P62101)
CLARK HILL PLC
*Attorneys for defendants City of Detroit,*
*Mayor Duggan, Chief Craig, Marshall*
*Bullock, R. Harris and K. Harris (sued*
*in their official capacity)*
500 Woodward Avenue, Suite 3500
Detroit, MI 48226
Phone: (313) 965-8300
rturner@clarkhill.com
ctrebilcock@clarkhill.com

---

## BRIEF IN SUPPORT OF DEFENDANTS' MOTION
## FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ...........................................................................................1

LEGAL STANDARD......................................................................................2

STATEMENT OF UNDISPUTED FACTS .....................................................3

    A. PARTIES ............................................................................................3

    B. THE CENTRE PARK BAR LEASE AND CITY-ISSUED PERMITS .....................4

    C. PLAINTIFFS WERE LESS THAN IDEAL TENANTS ........................................5

    D. INDIVIDUAL PLAINTIFFS PETITIONED FOR SPECIAL TREATMENT AFTER
       THEIR PROPOSAL WAS REJECTED FOR BEING LATE (JUST LIKE ALL
       OTHER UNTIMELY SUBMISSIONS) ...........................................................7

    E. INDIVIDUAL PLAINTIFFS FAILED TO PROVIDE ANY ADMISSIBLE
       EVIDENCE TO SUPPORT THE SUMMER 2016 NOISE ORDINANCE
       CITATIONS (OR ANY OTHER CITATIONS) WERE RETALIATORY OR
       PART OF ANY "CONSPIRACY." ................................................................8

    F. BRIDGEWATER WAS ARRESTED ON JULY 23, 2017 FOR OBSTRUCTING A
       FIRE OFFICIAL SINCE HE REFUSED TO CLOSE THE OVERCROWDED AND
       UNMONITORED OUTDOOR AREA............................................................10

LEGAL ARGUMENT.....................................................................................13

I.  This Court Should Grant Summary Judgment on Counts I and VIII (First
    Amendment Retaliation) of the Complaint Because the Individual Plaintiffs
    Have Failed to Provide Anywhere Near Enough Evidence to Create
    Genuine Issues of Material Fact on Causal Connection and/or the
    Existence of a City Custom, Plan, or Policy...................................................13

    A. DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON COUNT I BECAUSE
       NO CAUSAL CONNECTION CAN BE ESTABLISHED NOR A CITY CUSTOM,
       POLICY OR PRACTICE THAT WAS THE DRIVING FORCE BEHIND THE
       ALLEGED DEPRIVATIONS OF RIGHTS. .......................................................14

    B. DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON COUNT VIII
       BECAUSE NO CAUSAL CONNECTION CAN BE ESTABLISHED NOR A CITY
       CUSTOM, POLICY OR PRACTICE THAT WAS THE DRIVING FORCE
       BEHIND THE ALLEGED DEPRIVATIONS OF RIGHTS.....................................20

i

II.   This Court Should Grant Summary Judgment on Count III (Equal Protection)
      of the Complaint Because the Individual Plaintiffs Have Failed to Provide
      Anywhere Near Enough Evidence to Create Genuine Issues of Material
      Fact on the Existence of Similarly-Situated Individuals Who Were Treated
      Better Due to Their Class and/or the Existence of a City Custom, Plan, or
      Policy of Racist Application of the Fire Ordinance.........................................21

III.  Count IX Fails To State A Claim Upon Which Relief Can Be Granted ........25

CONCLUSION .......................................................................................................25

ii

# INDEX OF EXHIBITS

Exhibit A—Café Permit

Exhibit B—Affidavit of David Kipfmiller, signed 12/15/18

Exhibit C—July 2016-September 2016 noise complaint records

Exhibit D—October 2016-August 2017 noise complaint records

Exhibit E—Nuisance Abatement Order

Exhibit F— August 29, 2017 Transcript of Preliminary Injunction Hearing

Exhibit G—Deposition of Kenneth Scott Bridgewater on 5/25/18

Exhibit H—E-mails exchanged between Gwendolyn Williams and Christopher
Williams with City officials between December 2015 and February 2016

Exhibit I—Deposition of Gwendolyn Williams on 3/16/18

Exhibit J—Fire Marshall Division Reports

Exhibit K—Noise Ordinance Citations

Exhibit L—Deposition of DFD Capt. Kelvin Harris on 2/12/18

Exhibit M—DPD Ofc. Robert Harris report on arrest of Kenneth Scott Bridgewater

Exhibit N—Deposition of DPD Ofc. Robert Harris on 2/12/18

Exhibit O—Deposition of Christopher Williams on 3/14/18

Exhibit P—Photos of Nightclub Events

Exhibit Q—Deposition of Christopher Williams on 4/2/18

220812262.1 22387/340020

## TABLE OF AUTHORITIES

**Cases**

*Abdulnour v Campbell Soup Supply Co.*, *LLC*, 502 F.3d 496 (6th Cir. 2007)..........3
*Alkire v Irving*, 330 F.3d 802 (6th Cir. 2003) ............................................13
*Anderson v Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).........................3
*Bannum, Inc. v City of Louisville*, 958 F.2d 1354, (6th Cir. 1992) ..........................23
*Burgess v Fischer*, 735 F.3d 462 (6th Cir. 2013) ..........................................17
*Celotex Corp. v Catrett*, 477 U.S. 317, 322 (1986) .......................................3
*City of Los Angeles v Heller*, 475 U.S. 796, 799 (1986) .............................21
*Club Italia Soccer & Sports Org., Inc. v Charter Twp. of Shelby,*
    *Mich.*, 470 F.3d 286 (6th Cir. 2006)........................................................22
*Crawford-El v Britton*, 523 U.S. 574 (1998) ...............................................15
*Ctr. for Bio–Ethical Reform, Inc. v Napolitano*, 648 F.3d 365 (6th Cir. 2011) ......13
*Flagg v City of Detroit*, 715 F.3d 165 (6th Cir. 2013)..................................14
*Gutierrez v Lynch*, 826 F.2d 1534 (6th Cir. 1987)....................................19
*Hall v Wooten*, 506 F.2d 564 (6th Cir.1974) ...............................................25
*Harris v Bornhorst*, 513 F.3d 503 (6th Cir. 2008)........................................15
Henry v Metro. Sewer Dist., 992 F.2d 332 (6th Cir. 1990)..................................22
*Kentucky v Graham*, 473 U.S. 159 (1985)....................................................13
*Lambert v Hartman*, 517 F.3d 433, 439–40 (6th Cir. 2008) ................................13
*LRL Props. v Portage Metro Hous. Auth.*, 55 F.3d 1097 (6th Cir. 1995) ..............22
*Matshushita Elec. Indus. Co. v Zenith Radio Corp.*, 475 U.S. 574 (1986) ..............3
*Memphis, Tennessee Area Local, American Postal Workers*
    *Union, AFL–CIO v City of Memphis,* 361 F.3d 898, 905 (6th Cir. 2004) ............19
*Mount Healthy City Sch. Dist. Bd. of Educ. v Doyle*, 429 U.S. 274, 287 (1977)....15
*Paterek v Vill. Of Armada, Mich.*, 801 F.3d 630 (6th Cir. 2011) ...........................22
*Ryan v City of Detroit*, 174 F. Supp. 3d 964, 972 (E.D. Mich. 2016)....................22
*Scarbrough v Morgan County Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006) ....23
*Smith v Campbell*, 250 F.3d 1032 (6th Cir. 2001)....................................15
*Thaddeus–X v Blatter*, 175 F.3d 378 (6th Cir. 1999) ...............................13
*Thomas v City of Chattanooga*, 398 F.3d 426 (6th Cir. 2005) ...............................17
*U.S. v Green*, 654 F.3d, 637, 650 (6th Cir. 2011)....................................22
*United States v Diebold, Inc.*, 369 U.S. 654, 655 (1962) .........................2
*Vereecke v Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010)................15
*Warren v City of Athens*, 411 F.3d 697, 710-11 (6th Cir. 2005) ...........................24

**Statutes**

42 U.S.C. § 1983 ................................................................................2

42 U.S.C. § 1988 ...........................................................................2, 24

42 U.S.C. §1983 .............................................................................13

**Rules**

Fed. R. Civ. P. 56 .........................................................................2, 20

## ISSUES PRESENTED

A. Should this Court grant summary judgment on Counts I & VIII (first amendment retaliation) of the Second Amended Complaint in Defendant's[1] favor because Individual Plaintiffs[2] cannot establish the necessary elements and/or establish a custom or policy of the City of Detroit was a driving force behind the alleged deprivation of rights?

|  |  |
|---|---|
| Defendant: | Yes. |
| Individual Plaintiffs: | No. |

B.    Should this Court grant summary judgment on Count III (equal protection) of the Second Amended Complaint in Defendant's favor because Individual Plaintiffs cannot establish the necessary elements and/or establish a custom or policy of the City of Detroit was a driving force behind the alleged deprivation of rights?

|  |  |
|---|---|
| Defendant: | Yes. |
| Individual Plaintiffs: | No. |

D. Should this Court grant summary judgment on Count IX (claim for court costs and attorney fees) of the Second Amended Complaint in Defendant's favor because Individual Plaintiffs cannot establish the claim underlying it?

|  |  |
|---|---|
| Defendant: | Yes. |
| Individual Plaintiffs: | No. |

---

[1] The term "Defendant" collectively refers to the following parties who filed the current motion and brief in support: Detroit Mayor Michael Duggan ("Mayor Duggan"), Detroit Police Department Chief James Craig ("DPD Chief Craig"), Marshall Bullock ("Mr. Bullock"), Detroit Police Department Officer Robert Harris ("DPD Ofc. Harris") and Detroit Fire Department Captain Kelvin Harris ("DFD Capt. Harris") who were all sued in their official capacities, as well as the City of Detroit.

[2] The term "Individual Plaintiffs" collectively refers to: Gwendolyn Williams, Christopher Williams, and Kenneth Scott Bridgewater.

vi

Case 2:17-cv-13482-SFC-APP ECF No. 224, PageID.8194 Filed 01/04/19 Page 43 of 55

### CERTIFICATION UNDER LR 7.1(A)

There was a conference between attorneys or unrepresented parties and other persons entitled to be heard on the motion in which the movant explained the nature of the motion or request and its legal basis and requested but did not obtain concurrence in the relief sought.

# **INTRODUCTION**

On September 29, 2017, Individual Plaintiffs and the entity they own and control, Plaintiff Lotus Industries, LLC d/b/a Centre Park Bar ("Centre Park Bar") (collectively "Plaintiffs"), filed their Second Amended Verified Complaint for Declaratory Judgment and Injunctive Relief ("Complaint"). The Complaint primarily alleges a conspiracy by two entities and five individuals to retaliate against Plaintiffs for purportedly exercising their First Amendment rights. In addition, the Complaint blindly alleges the Defendant unequally enforced its noise and capacity ordinances against the Plaintiffs due to their race. The Complaint contains four counts against the Defendant: First Amendment Retaliation—Counts I & VIII; Equal Protection—Count III; and Attorney's Fees—Count IX. The Court should grant summary judgment in Defendant's favor on all of them.

First, Individual Plaintiffs cannot establish Defendant retaliated against them for allegedly exercising their First Amendment rights because: (a) they cannot establish a temporal proximity between their communications with Defendant's officials and the intervening hotel complaints; (b) they have failed to provide any concrete evidence that the Defendant had a retaliatory motive for issuing noise ordinance citations to the Individual Plaintiffs or purportedly harassing Centre Park Bar patrons; and (c) they have failed to establish any unlawful City custom, policy, or practice. Second, Individual Plaintiffs cannot establish Defendant denied them

1

equal protection of the law because there is no evidence the Individual Plaintiffs' business (i.e., Centre Park Bar) was treated differently than similarly situated businesses. Third, Individual Plaintiffs cannot, in any event, establish *any* of their 42 U.S.C. § 1983 claims because there is no evidence a custom or policy of the City of Detroit was the driving force behind the alleged deprivations of constitutional rights. Finally, no cause of action exists for a claim for attorney's fees under 42 U.S.C. § 1988. Accordingly, this Court should grant summary judgment in Defendant's favor on all counts of Individual Plaintiffs Complaint.[3]

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(C). All "inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *United States v Diebold*, *Inc*., 369 U.S. 654, 655 (1962). Summary judgment must be granted if the opposing party "fails to make a showing sufficient to establish the existence of an element essential to . . . [his or her] case, and on which . . . [he or she] will bear the burden of proof at trial."

---

[3] This motion does not request any relief against Centre Park Bar because, on November 9, 2018, this Court dismissed all claims made by Centre Park Bar in their entirety, with prejudice. (*See* ECF Doc. No. 208).

*Celotex Corp. v Catrett*, 477 U.S. 317, 322 (1986). If "a reasonable jury could return a verdict for the nonmoving party," summary judgment must be denied. *Anderson v Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). It is insufficient, however, simply to show "that there is some metaphysical doubt as to the material facts." *Matshushita Elec. Indus. Co. v Zenith Radio Corp*., 475 U.S. 574, 586 (1986). "[T]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *Abdulnour v Campbell Soup Supply Co*., *LLC*, 502 F.3d 496, 501 (6th Cir. 2007).

## STATEMENT OF UNDISPUTED FACTS

### A.  PARTIES

Centre Park Bar is a limited liability company organized under the laws of the State of Michigan, whose principal place of business is located within 1407 Randolph Street, Detroit, Michigan 48226 (the "Property"), which is in the Harmonie Park section of downtown Detroit, and which is now called the Paradise Valley Cultural and Entertainment District. (Def. Answer ¶14). Gwendolyn Williams ("G. Williams"), Christopher Williams ("C. Williams"), and Kenneth Scott Bridgewater ("Bridgewater") are the owners/operators of Centre Parke Bar.

Mayor Duggan is the duly elected Mayor of the City of Detroit and is a member of the Defendant City of Detroit Downtown Development Authority's

("DDA")[4] Board of Directors. (Def. Answer ¶18). Mr. Bullock is a mayoral appointee of Mayor Duggan and also served as a member of the DDA's Paradise Valley Evaluation Committee ("PV"). (Def. Answer ¶21).

### B. THE CENTRE PARK BAR LEASE AND CITY-ISSUED PERMITS

On August 19, 2013, DDA and Centre Park Bar executed a lease ("Lease") for the Property. (*See* ECF No. 48-1). The Lease contains a "Use of Premises" section. (*Id.* at §§ 7.1-7.5). The Use of Premises section contains restrictions, which describe and limit how Centre Park Bar may use the Property. (*Id.*). The first three sentences of the Use of Premises section state:

> [Centre Park Bar] shall use and occupy the Premises during the continuance of this Lease *solely* for the Designated Use set forth in Section 1.15 hereof, and for *no other purpose or purposes* without the prior written consent of [DDA]. [Centre Park Bar] shall not construct or install a dance floor in the Premises. [Centre Park Bar] *shall not operate a night club, dance hall, disco or other similar establishment* in the Premises.

(*Id.* at § 7.1) (emphasis added). The sole "Designated Use" is for a "[r]estaurant" with liquor sales that do not exceed forty percent (40%) of the gross sales generated by Centre Park Bar. (*Id.* at § 1.15). The Use of Premises section also states:

> [Centre Park Bar] shall not use or permit any person to use the Premises in any manner which violates or would create liability

---

[4] DDA was a defendant to the current suit, but this Court dismissed all claims against the DDA with prejudice as a discovery sanction against Plaintiffs on October 12, 2018. (*See* ECF No. 201 & 202).

under federal, state or local laws, ordinances, rules, regulations or policies.

The Use of Premises and Designated Use provisions were meant to ensure the Property was primarily used for dining, ***not*** as a nightclub or venue for live entertainment. (*See* ECF No. 48-1).

Centre Park Bar also sought and obtained a permit from the City of Detroit to operate an "outdoor café" on **City of Detroit** property adjacent to the leased space at the Property. (Café Permit attached as Exhibit A; *see* ECF No. 48-13). The permit, as approved by the City, allowed for tables and chairs in a partially enclosed space across the public sidewalk from the restaurant. (Exhibit A). The permit limited use from April to November, required closing at 1:00 A.M., had designated entrances/exits, required that the sidewalk not be obstructed, prohibited use of a portable bar, and required compliance with the City of Detroit's noise ordinance. (Exhibit A; *see* ECF No. 48-13). Similar outdoor cafes are permitted by the City around the downtown area. (*See* ECF No. 48-13).

## C. PLAINTIFFS WERE LESS THAN IDEAL TENANTS

During the Lease, Plaintiffs were less than ideal tenants and neighbors as they illegally operated a dance club, nightclub and cabaret on City-owned property adjacent to the Property for which the only allowed use is to serve food and drinks. (*See* ECF No. 48-1 and -6 to -10; Exhibit A).

5

For example, on June 26, 2016, a hotel patron named Tamala Joyner at the Hilton Garden Inn Downtown Detroit ("Hilton"), which is within 400 feet of the Property (ECF No. 48-3), called 911 shortly after midnight due to loud music. (¶3 of the attached Affidavit of David Kipfmiller, signed 12/15/18, Exhibit B ("hereafter DK Aff. ¶___")). A few days later, Hilton filed its own complaint with the City of Detroit about loud music playing on a big sound system on a patio outside the Property. (DK Aff. ¶4). Over the course of the next three (3) months, Mr. Kipfmiller (Hilton's general manager) and the Detroit Police Department tried to resolve the late night noise issues at the Centre Park Bar through early Fall 2016, which resulted in five (5) additional 911 calls by Hilton guests in less than three months. (*See* attached Exhibit C (records of five (5) 911 calls by Hilton guests complaining about the noise at Centre Park Bar between July 27, 2016 and September 18, 2016)).

The issues, however, did not end as the City of Detroit received twenty (20) more late night noise complaints about Centre Park Bar between October 2016 and August 2017. (DK Aff. ¶¶7-12; *see* attached Exhibit D (20 subsequent noise complaints between October 2016 and August 2017 about Centre Park Bar from other Hilton guests)). As a result, on August 29, 2017, the City of Detroit and DDA were able to successfully enjoin the Plaintiffs from violating the City of Detroit noise ordinance (Detroit, Mich., City Code §§ 36-1-1 to -1-6) and prohibit live and

6

amplified DJ music on the patio outside of the Property, pursuant to an Order for Preliminary Injunction and Immediate Abatement of Nuisance ("Nuisance Abatement Order") from (then) Chief Judge of the Circuit Court of Wayne County, Robert J. Colombo, Jr. (*See* Nuisance Abatement Order, attached as Exhibit E; *see also* Transcript of Preliminary Injunction Hearing at 6:5-:25, 7:12-:22, and 9:11-:15, attached as Exhibit F).

### D. INDIVIDUAL PLAINTIFFS PETITIONED FOR SPECIAL TREATMENT AFTER THEIR PROPOSAL WAS REJECTED FOR BEING LATE (JUST LIKE ALL OTHER UNTIMELY SUBMISSIONS)

In the Fall of 2015, the DDA invited bids for the purchase and development of a number of DDA buildings and property in Harmonie Park (including of 1407 Randolph, the Property). The deadline to submit bids was November 11, 2015 at 3:00 p.m. (*See* Deposition of Kenneth Scott Bridgewater at 24:25 to 27:23, attached as Exhibit G). It is undisputed that Centre Park Bar and its owners/operators (i.e., the Individual Plaintiffs) submitted a bid to the DDA after the deadline, and that their late bid was rejected along with the two bids also submitted after the deadline. (*See Id.*; Complaint ¶ 34). Between December 2015 and February 2016, G. Williams and C. Williams exchanged emails and met with City officials to complain that their bid had been rejected by the DDA. (*See* the relevant e-mails attached as Exhibit H). In response to G. Williams and C. Williams' claimed fear of losing the Lease with the DDA, the City offered to help

7

locate another place for the Centre Park Bar. (*See* Exhibit H (Thomas Lewand e-mail on 12/22/2015 and G. Williams e-mail on 2/9/2016); Deposition of Gwendolyn Williams on 3/16/18 at 47:1-48:4, attached as Exhibit I). That offer was never taken.

On June 29, 2016, Mayor Duggan and DDA officials announced the successful bidders for the development of Harmonie Park, rechristened as the Paradise Valley Entertainment District. (*See* ECF No. 48-14).

**E. INDIVIDUAL PLAINTIFFS FAILED TO PROVIDE ANY ADMISSIBLE EVIDENCE TO SUPPORT THE SUMMER 2016 NOISE ORDINANCE CITATIONS (OR ANY OTHER CITATIONS) WERE RETALIATORY OR PART OF ANY "CONSPIRACY."**

On May 30, 2016, the City Fire Department's Fire Marshall Division was summoned to the Centre Park Bar by the Detroit Police Department to address a large crowd complaint. (*See* the Fire Marshall Reports attached as Exhibit J (specifically the May 30, 2016 report)). While the police had controlled and dispersed the crowd before DFD Lt. Edward Davis arrived, he discovered that Centre Park Bar did not have occupancy cards for the inside bar or outdoor café space required for all places of public assembly. (*Id.*). The Detroit Fire Code requires that occupancy cards issued by the Fire Marshall be posted at all places of public assembly, and requires that the owner/operator ensure that the occupancy limits are not exceeded. (Detroit, Mich., City Code §§ 8-1.1.1 & -1.1.3 to -1.1.4).

8

As discussed before in Section C, Hilton guests (separated from Centre Park Bar by only a narrow two-lane road) raised a number of noise complaints against Centre Park Bar all throughout the summer of 2016, which resulted in frequent visits and the occasional noise ordinance citation by the Detroit Police Department. (*See* Exhibit C and DK Aff. ¶¶ 4-8). However, it is undisputed that the Individual Plaintiffs have not produced one admissible piece of evidence to corroborate their belief that the Defendant was involved in a conspiracy to have individuals file noise complaints against Centre Park Bar or noise ordinance citations issued to Individual Plaintiffs. (*See* Complaint ¶¶53-55, 80-82, and 85). For example, Individual Plaintiffs have failed to corroborate any of their allegations (*see id.* ¶¶44-45 & 71-72) related to the noise ordinance citation DPD Lt. Ilaseo Lewis ("DPD Lt. Lewis") issued C. Williams on August 6, 2016. (*See* Noise Ordinance Violation Citations attached as Exhibit K). Instead, Defendant has provided evidence that despite the Fire Marshall discovering no occupancy card posted in the café area that same night, the Fire Marshall responded by returning on August 17, 2016 to survey the interior bar and outdoor café space of Centre Park Bar to determine the lawful occupancy load, and provide C. Williams with instruction on the use of "clickers" to monitor occupancy. (*See* Exhibit J).

9

### F. BRIDGEWATER WAS ARRESTED ON JULY 23, 2017 FOR OBSTRUCTING A FIRE OFFICIAL SINCE HE REFUSED TO CLOSE THE OVERCROWDED AND UNMONITORED OUTDOOR AREA

On July 23, 2017, DFD Capt. Harris was called to the Centre Park Bar to investigate a complaint of overcrowding on the Property. (*See* DFD Capt. Harris report dated 7/23/17 within Exhibit J; Deposition of DFD Capt. Kelvin Harris[5] on 2/12/18 at 14:25-15:6, attached as Exhibit L). DFD Capt. Harris made contact with Bridgewater, who identified himself as management, upon entering the Property at or around 12:40 A.M. (Exhibit J; Exhibit L at 19:19-:23). DFD Capt. Harris asked Bridgewater how many people were admitted within the outdoor area of the bar, but he did not know. (Exhibit J; *see* Exhibit L at 19:4-14). DFD Capt. Harris also asked Bridgewater to show him the occupancy card for the outdoor space, but Bridgewater was unable to show the card was posted (or even provide the card at that point in time). (Exhibit J; Exhibit L at 19:24-20:9). DFD Capt. Harris explained that the occupancy card posting was a requirement of the Centre Park Bar's outdoor cafe permit, but also necessary for the bar to determine (on its own) whether it was exceeding the authorized capacity levels. (*See* Exhibit J; Detroit, Mich., City Code §§ 8-1.1.1 & -1.1.4). Bridgewater left to get the "owner," C. Williams; upon their return, DFD Capt. Harris explained that the lack of an occupancy card and knowledge of the exact number of people meant they would

---

[5] The transcript incorrectly listed DFD Capt. Harris' first name as "Calvin."

all have to vacate the Property's premises. (Exhibit J; Exhibit L at 17:15-:20). DFD Capt. Harris assured C. Williams that his decision was necessary for everyone's safety. (*See* Exhibit J). At around 1:00 A.M., C. Williams used the disk jockey's microphone to announce that all patrons needed to evacuate the premises. (Exhibit L at 26:14-:25*; see* Exhibit J).

A few minutes later, Bridgewater approached DFD Capt. Harris with a purportedly valid occupancy card and claimed the bar no longer needed to be closed. (*See* Exhibit J; Exhibit L at 18:4-:6). DFD Capt. Harris however explained that it was too late to reverse his order and that he still had not been furnished with the number of people already admitted. (*See* Exhibit J; Exhibit L at 19:4-:14). Bridgewater told the DJ to start the music again and he personally used the DJ's microphone to announce that the bar was not closing. (Exhibit L at 22:11-:15; *see* Exhibit J). DFD Capt. Harris then ordered the DJ to turn the music off, but the DJ refused because Bridgewater was paying him. (*See* Exhibit J; Exhibit L at 26:6-:9). DFD Capt. Harris approached C. Williams with same order, but he ignored DFD Capt. Harris. As a result, DFD Capt. Harris went and spoke with DPD Ofc. Harris (he was posted outside of the Property at the time (*see* DPD Ofc. Harris report on arrest of Bridgewater, attached as Exhibit M; Exhibit L at 22:6-:19)) to report that the Centre Park Bar proprietors were being uncooperative, and for public safety was requiring the venue to cease outdoor operations. (*See* Exhibit J).

11

DPD Ofc. Harris then asked Bridgewater and C. Williams to turn off the music and vacate the premises, but they both refused. (*See* Exhibits J & M). DPD Ofc. Harris then explained that obstructing a fire official was an arrestable offense. (Exhibit M). DPD Ofc. Harris asked Bridgewater and C. Williams to comply with DFD Capt. Harris' order, but Bridgewater refused and told DPD Ofc. Harris to write him a ticket, but the bar would not close. (*Id.*). Despite DPD Ofc. Harris warning about a possible arrest, Bridgewater then stated "arrest me then" and turned around and put his hands behind this back. (*Id.*). DPD Ofc. Harris gave Bridgewater one more chance to comply, but he refused and thus DPD Ofc. Harris arrested Bridgewater for obstructing a fire official by failing to comply with DFD Capt. Harris' order to close. (*See* Exhibit M; Deposition of DPD Ofc. Robert Harris on 2/12/18 at 19:24-21:4, attached as Exhibit N). C. Williams then used the DJ's microphone to announce yet again that everyone needed to vacate the outdoor area because it was deemed unsafe due to overcrowding. (*See* Exhibit J). It is undisputed that DPD Ofc. Harris alone decided to arrest Bridgewater. (*See* Exhibit L at 23:3-:5; Exhibit N at 19:24-21:4).

12

## LEGAL ARGUMENT

I.     **This Court Should Grant Summary Judgment on Counts I and VIII (First Amendment Retaliation) of the Complaint Because the Individual Plaintiffs Have Failed to Provide Anywhere Near Enough Evidence to Create Genuine Issues of Material Fact on Causal Connection and/or the Existence of a City Custom, Plan, or Policy**

To establish a First Amendment Retaliation claim under 42 U.S.C. §1983, the Individual Plaintiffs must show that: (1) they engaged in protected conduct; (2) an adverse action was taken against them that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct. *Thaddeus–X v Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc); *see also Ctr. for Bio–Ethical Reform, Inc. v Napolitano*, 648 F.3d 365, 372 (6th Cir. 2011) ("Although much of our First Amendment retaliation jurisprudence addresses claims by public employees and prisoners, the same legal framework applies where, as here, private parties challenge governmental action."). Note however that since the Individual Plaintiffs only brought their claims brought against Defendant's officials in their official capacities, the City of Detroit is the only true defendant. *See Alkire v Irving*, 330 F.3d 802, 810 (6th Cir. 2003) (citing and quoting *Kentucky v Graham*, 473 U.S. 159, 165 (1985)); *see also Lambert v Hartman*, 517 F.3d 433, 439–40 (6th Cir. 2008). Therefore, the Individual Plaintiffs First Amendment Retaliation

13

claims are contingent upon the Individual Plaintiffs proving that their constitutional deprivation occurred pursuant to a municipal "policy or custom." *Flagg v. City of Detroit*, 715 F.3d 165, 174-75 (6th Cir. 2013) (citations and quotations omitted).

The Defendant is entitled to judgment on both of the Individual Plaintiffs' First Amendment Retaliation claims because: (a) in Count I the Individual Plaintiffs have failed to provide any evidence of a City custom or policy and/or to establish any causal connection between any protected conduct and an adverse action; and (b) in Count VIII DPD Ofc. Harris had probable cause for arresting Bridgewater for obstructing a fire official as he refused to close the bar as ordered due to overcrowding and missing permits.

### A. DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON COUNT I BECAUSE NO CAUSAL CONNECTION CAN BE ESTABLISHED NOR A CITY CUSTOM, POLICY OR PRACTICE THAT WAS THE DRIVING FORCE BEHIND THE ALLEGED DEPRIVATIONS OF RIGHTS.

Individual Plaintiffs claim Defendant took adverse action against them for publicly criticizing the RFP process by: (1) issuing noise citations to Plaintiff, and (2) harassing Centre Park Bar patrons. (Complaint ¶¶2, 56-83 & 140-146). Assuming *arguendo* that a genuine issue of material fact exists on whether the Individual Plaintiffs engaged in protected activity and whether an adverse action (as understood within the First Amendment retaliation context) was taken against them, there is no evidence to support a causal connection between any purported

14

protected activity and the claimed adverse actions (i.e., a retaliatory motive or temporal proximity), let alone a pivotal City custom, policy, or practice.

First, the Individual Plaintiffs have failed to provide any concrete evidence that the Defendant had a retaliatory motive for issuing noise ordinance citations to the Individual Plaintiffs or purportedly harassing Centre Park Bar patrons. "[B]are allegations of malice [do] not suffice to establish a constitutional claim" at the summary judgment stage. *Vereecke v Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010) (alterations in original) (quoting *Crawford-El v Britton*, 523 U.S. 574, 588 (1998)). Moreover, the Individual Plaintiffs must be able to prove that the exercise of their claimed protected right was a substantial or motivating factor in the Defendant's alleged retaliatory conduct. *See Smith v Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v Doyle*, 429 U.S. 274, 287 (1977)). Individual Plaintiffs may use circumstantial evidence to support an inference of retaliatory motive. *See Harris v Bornhorst*, 513 F.3d 503, 520 (6th Cir. 2008). If the Individual Plaintiffs demonstrate that their "protected conduct was a motivating factor ... [,] the burden of production shifts to the defendant," who must respond with legitimate reasons for his actions. *Thaddeus-X*, 175 F.3d at 399 (citation omitted). "If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment." *Id.*

The Individual Plaintiffs have not pointed to one corroborated statement made by Defendant officials that would suggest City animus toward them or provided any evidence that the Individual Plaintiffs were treated differently than other, similarly situated individuals, because of the Individual Plaintiffs' criticism of the RFP process. Even further the Individual Plaintiffs have failed to identify any specific similarly-situated individuals who were treated better. Instead Plaintiffs have merely speculated that "[n]o other bar or restaurant establishments in the immediate area have been subjected to the frequent constant police harassing visits that Centre Park Bar and the Plaintiffs have been subjected to" (Complaint ¶78). Overall Individual Plaintiffs only have offered speculation and uncorroborated specious conspiracy theories about the Defendant officials' motives.

In addition, no temporal proximity exists between any of the Individual Plaintiffs' RFP process scrutiny or communications with City officials from December 2015 to February 2016, and the August 2016 noise ordinance ticket or the ambiguous purported harassment 6 months later. Further, the Individual Plaintiffs cannot rely on the June 2016 announcement of the RFP process bid winners (*see* ECF No. 48-14) to fabricate a temporal proximity because their conspiracy theories are uncorroborated and merely speculative (as discussed *infra*).

Second and more importantly though, the Individual Plaintiffs failed to

16

provide any evidence that a City custom, policy, or practice to harass bar patrons or issue noise ordinance tickets in retaliation to RFP process scrutiny. The Individual Plaintiffs must show one of the following to prove this claim:

> (1) the existence of an illegal official policy or legislative enactment;
> (2) that an official with final decision making authority ratified illegal actions;
> (3) the existence of a policy of inadequate training or supervision; or
> (4) the existence of a custom of tolerance or acquiescence of federal rights violations.

*Burgess v Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citing *Thomas v City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). "A municipality 'may not be sued under § 1983 for an injury inflicted solely by its employees or agents.' " *Id.* (quoting *Monell*, 436 U.S. at 694). The Individual Plaintiffs did not provide any evidence to support its conclusory allegations of Defendant's "practice of frequent visits by the police is to disrupt the events and to make patrons uncomfortable." (Complaint ¶77). Instead Defendant's produced ample evidence of valid noise complaints that financially impacted surrounding businesses. (*See* DK Aff. ¶¶13-19; Exhibits C-F & K). The Individual Plaintiffs' allegation that "Lt. Lewis informed Plaintiff C. Williams at that time that he had been given a direct order to shut down Centre Park by Defendants Duggan and Chief Craig" fails since Plaintiff C. Williams has since admitted the absence of any documents "to support or prove" their claim "police officers" were "directed ... to harass the plaintiffs." (*See* Deposition of Christopher Williams on 3/14/18 at 10:7-:20, attached as Exhibit O).

Further, the Individual Plaintiffs speculative allegation that Mr. Bullock told Bridgewater that "Centre Park's patrons were not 'the type of clientele' the [ ] Mayor wanted in Downtown Detroit" and "that Centre Park would be evicted from the Property by January 2017 because it would be found in violation of its Lease" (Complaint ¶74), is nullified by the fact that: (a) Mr. Bullock obviously lacked final decision-making authority for the Defendant police or fire; and (b) Individual Plaintiffs were violating the Use of Premises and Designated Use provisions of the Lease by illegally operating a dance club, nightclub and cabaret on City-owned property adjacent to the Property for which the only allowed use is to serve food and drinks. (*See* ECF No. 48-1 (§§ 1.15 & 7.1-7.5) and -6 to -10; Exhibit A; DK Aff. ¶6; Exhibit P (photos of Nightclub events at the Centre Park Bar); *see also* Exhibits E & F). Lack of training/supervision by the City is not at issue. Finally no evidence was produced to remotely support the existence of a custom of tolerance or acquiescence of federal rights violations.

The Individual Plaintiffs cannot rely on a civil conspiracy theory to establish a retaliatory motive or a City custom, policy, or practice to retaliate against RFP critics. Defendant did not conspire with anyone to issue noise citations to, or harass patrons at, Centre Park Bar. A civil conspiracy is an agreement between two or more persons to injure another by unlawful action. *Memphis, Tennessee Area Local, American Postal Workers Union, AFL–CIO v City of Memphis,* 361 F.3d

18

898, 905 (6th Cir. 2004). Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy and each conspirator need not have known all of the details of the illegal plan or all of the participants involved. *Id*. But a plaintiff must show "[a] there was a single plan, [b] that the alleged coconspirator shared in the general conspiratorial objective, and [c] that an overt act was committed in furtherance of the conspiracy." *Id*. Significantly, conspiracy claims must be established with "**some degree of specificity**" and "**vague and conclusory**" assertions unsupported by material facts will not be sufficient to assert such a claim under § 1983. *See Gutierrez v Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987) (emphasis added).

Here, while Individual Plaintiffs "believe" Defendant (Mayor Duggan and Chief Craig) "conspired" with Archer, DDA, DEGC, officers and others to retaliate against them (Complaint, ¶¶ 81-82), aside from their own convenient and speculative testimony, there has never been any evidence proffered supporting their allegation. There is no evidence of a *singular* plan between Defendant and others to ticket and harass Plaintiffs. There is no evidence Defendant shared some broader conspiratorial objective to dispossess Plaintiffs because of their alleged public criticisms of the RFP process. And there is no evidence the noise ordinance citations the Individual Plaintiffs received were merely pretextual acts in furtherance of some conspiracy.

19

Indeed, on August 29, 2017, (then) Chief Judge Colombo confirmed the legitimacy of the citations Centre Park Bar received by issuing his Nuisance Abatement Order. (*See* Exhibit F) (See also Exhibit D). After a multi-day evidentiary hearing, Judge Colombo specifically ordered the Plaintiff to "immediately abate the nuisance and ... enjoined [them] from any and all further violations of *the Detroit noise ordinance*...." (Exhibit E) (emphasis added). There are simply no pleadings, depositions, affidavits, answers to interrogatories, or admissions on file, which demonstrate – let alone with any specificity – Defendant participated in a conspiracy. *See* FED. R. CIV. P. 56. In fact, even the Individual Plaintiffs are aware they have nothing more than "vague and conclusory" assertions; they have admitted the absence of any documents "to support or prove" their claim "police officers" were "directed ... to harass the plaintiffs." (Exhibit O at 9:24-10:22).

### B. DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON COUNT VIII BECAUSE NO CAUSAL CONNECTION CAN BE ESTABLISHED NOR A CITY CUSTOM, POLICY OR PRACTICE THAT WAS THE DRIVING FORCE BEHIND THE ALLEGED DEPRIVATIONS OF RIGHTS.

Bridgewater claims he "was arrested in retaliation for simply exercising his First Amendment Right of Free Speech by requesting [DPD Ofc. Harris and DFD Capt. Harris] to count the number of attendees and for stating that the Defendants were retaliating against Plaintiffs for filing the instant federal lawsuit." (Complaint ¶146). This count fails for the same reasons as Count I: (a) no evidence of an

unlawful City custom, policy or practice was provided; and (b) DPD Ofc. Harris had probable cause to arrest Bridgewater for obstructing a fire fighter because Bridgewater refused to comply with DFD Capt. Harris' order to close due to missing permits and over occupancy (Bridgewater asked for a ticket instead, but clearly stated he refused to close) (*see* Exhibits J & M). *See also City of Los Angeles v Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the [municipality's] officer, the fact that the [policy, practice, or custom] might have authorized the use of constitutionally excessive force is quite beside the point."). In addition, there is a reason why you typically see lines outside of popular nightclubs and other popular nightlife attractions; the Detroit Fire Code requires that the owner/operator ensure that the occupancy limits are not exceeded. *See* Detroit, Mich., City Code §§ 8-1.1.1 & -1.1.3 to -1.1.4.

Accordingly, this Court should grant summary judgment on Counts I & VIII of the Complaint because the Individual Plaintiffs cannot establish the necessary elements of their First Amendment Retaliation claims.

**II.    This Court Should Grant Summary Judgment on Count III (Equal Protection) of the Complaint Because the Individual Plaintiffs Have Failed to Provide Anywhere Near Enough Evidence to Create Genuine Issues of Material Fact on the Existence of Similarly-Situated Individuals Who Were Treated Better Due to Their Class and/or the Existence of a City Custom, Plan, or Policy of Racist Application of the Fire Ordinance**

21

"To state a claim under the Equal Protection Clause, a § 1983 plaintiff must allege that a state actor intentionally discriminated against the plaintiff because of membership in a protected class." *LRL Props. v Portage Metro Hous. Auth.*, 55 F.3d 1097, 1111 (6th Cir. 1995) (quoting Henry v Metro. Sewer Dist., 992 F.2d 332, 341 (6th Cir. 1990)). An Equal Protection claim must also show that differential treatment resulted from discriminatory intent. See R*yan v City of Detroit*, 174 F. Supp. 3d 964, 972 (E.D. Mich. 2016). "To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff 'disparately as compared to similarly situated persons and that such disparate treatment ... targets a suspect class....' " *Napolitano*, 648 F.3d at 379 (quoting *Club Italia Soccer & Sports Org., Inc. v Charter Twp. of Shelby, Mich.*, 470 F.3d 286, 299 (6th Cir. 2006)). Similarly situated means that "a comparator ... must be similar in 'all relevant respects.' " *Paterek v Vill. Of Armada, Mich.*, 801 F.3d 630, 650 (6th Cir. 2011) (quoting *U.S. v Green*, 654 F.3d, 637, 650 (6th Cir. 2011)). Because Plaintiff cannot point to a similarly situated individual who the City treated more favorably, and did so pursuant to a custom, policy or practice of the City, the City is entitled to summary judgment on this claim.

The Individual Plaintiffs *allege* Centre Park Bar was "unfairly and unlawfully targeted for harassment by [Mayor] Duggan and Chief Craig because it is an African-American black owned business and the majority owner ... is an

African-American woman and because a majority of its patrons are African-American." (Complaint ¶ 96). The Individual Plaintiffs further *allege* "[n]o other bar or restaurant establishment in the Harmonie Park or Paradise Valley area have been subjected to the similar police harassment for purported noise complaints or for claimed 'over capacity' violations of the City's Fire Code." (*Id.* at ¶ 97). But Individual Plaintiffs have failed to produce any *evidence* supporting these conclusory allegations.

For example, Individual Plaintiffs have failed to produce any evidence establishing they were treated differently than businesses similarly situated to Centre Park Bar. The basis of an equal protection claim is disparate treatment by the government of those who are similarly situated. See *Bannum, Inc. v City of Louisville*, 958 F.2d 1354, 1359-1360 (6th Cir. 1992); *see also Scarbrough v Morgan County Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006) ("The threshold element of an equal protection claim is disparate treatment."). Here, while Individual Plaintiffs have vaguely suggested "Old Shillelagh's" and other unidentified, so-called "white bars" were not issued citations for supposedly similar conduct, aside from Individual Plaintiffs own nonspecific speculation, there is no evidence supporting their claim. To wit:

> Q:     And do you know if complaints were made and no response was – that the police did not respond to noise complaints about any other businesses?

A:     **No, they haven't.**

Q:     Do you know that?

A:     **Yes, I know that.**

Q:     Do you know that complaints were made?

A:     **I know complaints were made about me –**

Q:     No, no.

A:     **I know that complaints were not made about them.**

Q:     Okay.

A:     **Because if complaints were made about them, they will be shut down like I was.**

(*See* Deposition Transcript of Christopher Williams on 4/2/18 at 272:4-:18, attached as Exhibit Q (emphasis in original)).

Moreover, even if these conclusory assertions were somehow sufficient (they are not), there remains a complete absence of evidence the citations issued to Centre Park Bar were "so unrelated to the achievement of any combination of legitimate purposes that the court can only conclude that the government's actions were irrational." *Warren v City of Athens*, 411 F.3d 697, 710-11 (6th Cir. 2005). In fact, the actual evidence establishes the opposition conclusion. Accordingly, this Court should grant summary judgment on Count III of the Complaint because Individual Plaintiffs cannot establish the necessary elements of their Equal Protection claim.

24

## III. Count IX Fails To State A Claim Upon Which Relief Can Be Granted.

Count IX of the Amended Complaint alleges a claim for attorney's fees under 42 U.S.C. § 1988. There is no such cause of action. *See Hall v Wooten*, 506 F.2d 564, 568 (6th Cir.1974) ("[w]e have held that section 1988 does not create federal causes of action for violation of civil rights").

## <u>CONCLUSION</u>

Individual Plaintiffs simply cannot support any of the claims they have asserted. Defendant respectfully request that this Honorable Court grant its Motion for Summary Judgment and dismiss Individual Plaintiffs' Complaint with prejudice.

Respectfully submitted,

CLARK HILL PLC

By: /s/Reginald M. Turner, Jr.
Reginald M. Turner, Jr. (P40543)
Christopher M. Trebilcock (P62101)
CLARK HILL PLC
*Attorneys for defendants City of Detroit,*
*Mayor Duggan, Chief Craig, Marshall*
*Bullock, R. Harris and K. Harris (sued*
*in their official capacity)*
500 Woodward Avenue, Suite 3500
Detroit, MI 48226
(313) 965-8300
rturner@clarkhill.com
Date: January 4, 2019          ctrebilcock@clarkhill.com

25

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 4, 2019, I electronically filed the foregoing papers with the Clerk of the Court using the ECF system which will send notification of such filing to all of the parties of record.

CLARK HILL PLC

/s/Reginald M. Turner, Jr.
Reginald M. Turner, Jr.

# EXHIBIT 10

| Services | Price | Qty | Ext. Price |
|---|---|---|---|
| Project Management | $150.00 | 4 | $600.00 |
| Phase 1 | | | |
| Installation, Configuration & Setup (Estimated) | $150.00 | 24 | $3,600.00 |
| - Set up access for administrator full control.<br>- Configure Outlook access for each user mailbox.<br>- Access user mailbox via Outlook.<br>- Use Outlook search capabilities to search for each specific term.<br>- Export all mail found. | | | |
| Phase 2 | | | |
| Installation, Configuration & Setup (Estimated) | $150.00 | 35 | $5,250.00 |
| - Set up access for administrator full control.<br>- Configure Outlook access for each user mailbox.<br>- Access user mailbox via Outlook.<br>- Use Outlook search capabilities to search for each specific term.<br>- Export all mail found. | | | |
| Travel (Trip Fee) | $60.00 | 1 | $60.00 |
| | | Services Subtotal | $9,510.00 |

| Shipping | Price | Qty | Ext. Price |
|---|---|---|---|
| Shipping & Handling | $0.00 | 1 | $0.00 |
| | | Shipping Subtotal | $0.00 |

| Proposal Summary | | | Amount |
|---|---|---|---|
| | Services | | $9,510.00 |
| | Shipping | | $0.00 |
| | Total | | $9,510.00 |

Required Terms:
100% hardware & software product cost required as a deposit, labor balance due upon receipt of invoice. Project quoted is based upon initial evaluation, actual labor time and materials may vary. Installation and setup will be billed in accordance to actual time required. Sales tax will apply to product purchases unless exempt, standard travel charges will apply.

By signing this proposal, Customer agrees to incorporate into this agreement and abide Cygnus Systems, Inc's

24700 Northwestern Highway, Suite 600  |  Southfield, MI 48075 | 800.388.2280  |  cygnus-sys.com

     

EXHIBIT 11

 **NEXTPOINT**

# Statement of Work
## Prepared for: Kotz Sangster - DDA

## Project Scope

Thank you for selecting Nextpoint. This Agreement sets out the commercial terms of our relationship so we can get to work!

### Nature of the Service

Nextpoint provides a proprietary software-as-a-service to secure, store and access electronic files, data, text, audio, video, images and other confidential legal-related content.

You may grant Nextpoint access to whomever you see fit, staff, vendors, clients and other related parties (e.g., expert witnesses or other consultants) who have a legitimate reason to access your matters (collectively, "Authorized Users"). Any requirements or standards of conduct stated in this Agreement for you apply equally to such users.

Prior to accessing and using Nextpoint, you and your Nextpoint Authorized Users will be required to accept the Nextpoint Terms of Use.

**DOCUMENT IMPORTING:**

- **Data Assessment: (49 GB)**
    - Client to ship all data to Nextpoint
    - Data Type: Native Emails
- **Data Transfer:**
    - Transfer all data into Nexpoint File Room
- **Data Import:**
    - Start import batches
- **Quality Control:**
    - Match file counts

- Check metadata extraction
- Assess and repair import batches errors
- Organize in Nextpoint

## Nextpoint Project Estimate

| Description | Quantity | Unit Price | Total Price |
|---|---|---|---|
| Data | 49 GB | $250/GB | $12,250 |

*Pricing is valid for **45 days**, Payment Terms are Due on Receipt.

*Prices subject to change if the complexity/scope of the project changes due to an anomaly that could not have been previously identified.

# EXHIBIT 12

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT DAVIS, et al.,

        Plaintiffs,                          Case No. 17-cv-11742
                                             Hon. Mark A. Goldsmith

vs.

DETROIT DOWNTOWN
DEVELOPMENT AUTHORITY, et al.,

        Defendants.
_____/

### ORDER REGARDING CONTEMPT PROCEEDINGS

On November 6, 2018, this Court entered an opinion and order imposing sanctions on Plaintiffs' counsel, Andrew Paterson. 11/6/2018 Op. & Order (Dkt. 107). Mr. Paterson has failed to pay the sanctions ordered, claiming belatedly, after Defendants sought to hold him in contempt, that he is unable to do so. As stated at the April 11, 2019 hearing, the Court orders as follows:

- The parties shall confer in an attempt to come to an agreeable solution as to the payment that the Court has ordered.

- If the parties cannot reach agreement by April 18, 2019, Defendants will have thirty days to take discovery regarding Mr. Paterson's ability to pay. They may issue document requests, to which Mr. Paterson must respond and produce documents within ten days of being served. They may also serve third-party subpoenas and require that Mr. Paterson undergo a creditor's examination. Defendants' discovery may seek any and all information and records pertaining to Mr. Paterson's financial condition as to assets, liabilities, income and expenses, going back three years, including without limitation, tax returns, related tax documents, financial journals and ledgers, credit card and bank statements, and real property records. The requests may encompass both his personal records and the records of any trust of which he is a beneficiary and any business entity in which he is a principal, partner or shareholder. If Defendants determine that the thirty-day period is insufficient, they may continue discovery for another thirty days without seeking leave of court.

- After discovery is complete, Defendants shall have ten days to file a brief regarding the actions they would like the Court to take, citing appropriate authority. Mr. Paterson shall

1

file a response within ten days after service of Defendants' brief.

- If Defendants believe that the issue of Mr. Paterson's ability to pay has no bearing on this Court's authority to incarcerate him as part of a civil contempt process to compel compliance with the Court's order or to permanently bar him from practice in the Eastern District of Michigan as a sanction for noncompliance, they may file a brief setting forth their position. The brief must be filed no later than May 10, 2019. Mr. Paterson will then have one week to file a response.

SO ORDERED.

Dated: April 12, 2019              s/Mark A. Goldsmith
     Detroit, Michigan           MARK A. GOLDSMITH
                                United States District Judge

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on April 12, 2019.

                                s/Erica Karhoff for Karri Sandusky
                                Case Manager